218 N.J. Super. 123 (1987)
526 A.2d 1150
EDWIN J. DOBSON, JR., INC., PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
STATE OF NEW JERSEY, DEFENDANT, THIRD PARTY PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY, THIRD PARTY DEFENDANT, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 1987.
Decided June 11, 1987.
*124 Before Judges MORTON I. GREENBERG, J.H. COLEMAN and GRUCCIO.
Robert T. Lawless, Deputy Attorney General, argued the cause for appellant, cross-respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Robert T. Lawless on the brief).
Richard R. Bonamo argued the cause for respondents, cross-appellants (Wilentz, Goldman & Spitzer, attorneys; Richard R. Bonamo of counsel; Francis X. Journick, Jr., on the brief).
The opinion of the court was delivered by COLEMAN, J.H., J.A.D.
*125 This case involves a claim by a contractor against the State for delay damages arising out of a public construction project. The crucial question raised by this appeal is whether the exculpatory "no delay damage" clause in the contract precludes recovery. The trial judge sitting without a jury concluded that this clause did not preclude recovery. He awarded the contractor delay damages. We now reverse and enter judgment for the defendant.
The facts essential to our decision are not complicated despite the lengthy statement of facts in the briefs. On July 1, 1977 plaintiff Edwin J. Dobson, Jr., Inc., contracted with the New Jersey Division of Buildings and Construction (DOBC) to furnish and install a low pressure steam distribution system for 27 buildings at the State Home for Boys in Jamesburg. The contract called for the removal of about 2,000 feet of old pipe as well as the removal and/or installation of about 6,000 feet of underground conduits. The contract documents used in the bidding process called for Ric-Wil "galvanguard" conduit, but a bid could have been based on a substitute conduit of like quality if written approval was obtained. The notice to proceed with the job was given on July 1, 1977. The contract required the project to be completed by April 12, 1978. The job was not completed, however, until February 21, 1979 due to a series of delays.
On July 8, 1977 plaintiff submitted a purchase order to Ric-Wil for the required piping and materials. Ric-Wil did not respond to the purchase order until August 1, 1977 when its manager of sales and marketing, Carl D. Whisler, advised plaintiff that the purchase order contained conditions unacceptable to Ric-Wil. It agreed to accept the purchase order only if modified as follows:
1. Receipt of necessary field measurement values.
2. RICWIL, Inc. terms and conditions of sale will prevail in lieu of [plaintiff's] terms....
3. Shipments will be made on a cash-in-advance basis with payment received at RICWIL prior to shipment.

*126 4. No portion of the purchase price will be withheld.
5. RICWIL will provide "RICWIL Fiberglass insulation" to meet the heavy density fiberglass specification requirement.
6. Release of certain invoice dated January 30, 1975 is made.
The release related to a January 1975 invoice for $264,833 arising out of a sewer project known as the Southern Water Pollution Control Facility for the Ocean County Sewerage Authority. It was this outstanding claim for which plaintiff had sued Ric-Wil that apparently motivated Ric-Wil to insist on the foregoing modifications in plaintiff's purchase order. Ric-Wil wanted to protect itself against plaintiff attempting to satisfy its claim from proceeds payable pursuant to the present purchase order.
On or about August 9, 1977, plaintiff requested permission to use a substitute conduit because plaintiff was unwilling to comply with all of the conditions demanded by Ric-Wil. Joffre Lewis, Deputy Director of DOBC, held a conference in his office on August 16, 1977 concerning the request to use a substitute. Lewis advised plaintiff that the request for a substitution was rejected. He further advised plaintiff that unless plaintiff and Ric-Wil reached an agreement on the purchase order, DOBC would buy the conduit from Ric-Wil and back-charge plaintiff the purchase price plus a penalty. The rejection of a proposed substitute and the threat of a penalty persuaded plaintiff to accept Ric-Wil's conditions on August 16. Ric-Wil accepted plaintiff's order with the modifications on September 13, 1977.
Ric-Wil submitted a shipping schedule which called for shipments weekly between December 2, 1977 and January 20, 1978. DOBC granted plaintiff a 39 day delay extension because of the Ric-Wil problem. The shipping schedule meant that the conduit would arrive during the winter when bad weather could cause further delays in the installation. As it turned out, Ric-Wil was late with its deliveries. Consequently, plaintiff requested that Lewis grant another extension delay and reimburse plaintiff for additional expense. This request was denied. In addition to *127 the delays caused by Ric-Wil, plaintiff encountered further delays due to some uncharted obstacles. The job was completed 315 days later than required by the contract.
The present litigation was instituted after DOBC refused to compensate plaintiff for delay damages. In the first count of the complaint plaintiff alleged that it was entitled to economic damages because DOBC "breached the contract and actively interfered with the performance of plaintiff's work by requiring plaintiff to supply material from one manufacturer only...." In the second count plaintiff alleged that the conduct referred to in the first count amounted to bad faith. The third and fourth counts alleged that subsurface conditions that were not shown or described in the contract documents disrupted and interfered with plaintiff's performance thereby causing it additional expenses.
DOBC filed a counterclaim for liquidated delay damages. It also filed a third party complaint against Hartford Accident and Indemnity Company (Hartford) which supplied the performance bond for plaintiff. During the trial, DOBC stipulated that it would not pursue the claim against Hartford; that claim was dismissed. The judge dismissed DOBC's counterclaim. Judgment for $118,399 was entered without prejudgment interest in favor of plaintiff. DOBC has appealed and plaintiff has cross-appealed.
DOBC contends that the judge erred in finding it liable for delay damages resulting from the late delivery of Ric-Wil materials. The trial judge found that
the State DOBC, through Mr. Lewis, did improperly interfere with the supply contract between Dobson and Ric-Wil. By forcing Dobson to accept the Ric-Wil counterproposal, which failed to contain specific delivery dates, or be forced to pay a penalty to the State, the DOBC wrongfully interfered with the supply contract and is liable for part of the five and one-half months delay. The State's interference precluded Dobson from doing anything concerning its conduit supply contract except what Ric-Wil desired.
I accept as credible the testimony of Mr. Moore that Ric-Wil knew they were named as the preferred supplier of the conduit. This put Ric-Wil in a position where it could insist on highly favorable contract provisions. In this case, the fact that Dobson was forced to accept Ric-Wil's contract resulted in Dobson's uncertainty of what Ric-Wil would deliver and when.
*128 The judge concluded that the "no damage" for delay clause in the contract was no defense because Lewis' conduct amounted to bad faith and active interference by the State.
The no damage for delay clause, Paragraph 21E, provides:
[i]f the contractor be delayed in the completion of the work by act, neglect, or default of the State upon the work, or by changes ordered in the work, . .. or any cause beyond the contractor's control, ... then for all such delays and suspensions the contractor shall be allowed one day additional to the time herein stated for each and every day of such delay so caused in the completion of the work, ... and a similar allowance of extra time will be made for such other delays as the Architect/Engineer may find to have been caused by the State.... Apart from extension of time, no payment or allowance of any kind shall be made to the contractor as compensation for damages on account of hindrance or delay from any cause in the progress of the work, whether such delay be avoidable or unavoidable.
The no damage for delay clause is legal and the parties have not questioned its validity. Such a clause, however, is "generally construed strictly against its draftsman," and "special exceptions are often read into it...." Ace Stone, Inc. v. Wayne Township., 47 N.J. 431, 434 (1966). It is also clear that construction of the agreement between the parties must be sensible and in accordance with the parties' intention. Broadway Maintenance Corp. v. Rutgers, 90 N.J. 253, 271 (1982). Furthermore, the parties to a construction contract containing a no damage for delay clause contemplate that the contractor will bear the risks of ordinary and usual types of delays. Ace Stone, Inc., supra, 47 N.J. at 437-438. One exception to the general rule of no damage for delay is where the delay damages are caused by the active interference of the public agency. A. Kaplen & Son Ltd. v. Housing Authority of Passaic, 42 N.J. Super. 230, 234-235 (App.Div. 1956). Also, where the public agency's "conduct indicates bad faith or some other tortious intent," the agency is not protected by the no damage for delay clause. Gherardi v. Trenton Board of Education, 53 N.J. Super. 349, 365 (App.Div. 1958).
"Active interference" connotes more than negligence. While the term is not capable of precise definition, it contemplates reprehensible behavior beyond "a simple mistake, error *129 in judgment, lack of total effort, or lack of complete diligence...." Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F. Supp. 376, 399 (S.D.Iowa 1973). The public agency must commit some affirmative, willful act, in bad faith which unreasonably interferes with the contractor's compliance with the contract terms before it can be said that there has been active interference which subjects the public agency to delay damages notwithstanding the no damage for delay clause in the contract. Ibid. The ultimate determination must be based on the intention of the parties, Buckley & Co., Inc. v. State, 140 N.J. Super. 289, 299 (Law Div. 1975), as can be discerned from the contractual language in light of the circumstances. Broadway Maintenance Corp., supra, 90 N.J. at 270.
We agree with DOBC's argument that Lewis' conduct did not constitute active interference or amount to bad faith. While Lewis was mistaken as to whether substitution was permitted as of August 1977 and as to the anticipated cost of the conduit and material requested from Ric-Wil, those mistakes do not constitute bad faith. Clearly, Lewis was motivated to take action to protect the State's interest. Section ME-SGC.17 "Approved Materials & Substitutions" of the contract provided that written approval for substitution of materials had to be obtained from DOBC's Engineers
at least five (5) days, and preferably ten (10) days, prior to the date set for receiving the bids. If approval is granted, all bidders will be advised accordingly by the Engineers. No substitutions will be approved after that time, and the Contractor will be expected to adhere to the materials and methods specified or indicated on the drawings. [Emphasis added]
Even though the above contractual language prohibited substitution after a bid had been submitted, Paragraph 12F of the contract provided:
After the contract has been awarded, should the contractor desire to use some material other than that specified, he shall first make application to the Director in writing naming the difference in cost in each case, otherwise he will be held to what is specified. No changes shall be made without the written consent of the Director.
Paragraph 12E provided that the use of a brand or manufacturer such as Ric-Wil was intended as a standard. Hence, when *130 § ME-17, and paragraphs 12E and F are read together and the rule of strict construction is applied against DOBC, plaintiff had the right to request permission to use a substitute. Failure to approve the request for a substitution in the circumstances, however, does not establish active interference, bad faith or proximate cause of the delayed deliveries. There is no persuasive evidence that the intended substituted supplier would have delivered the conduit and materials sooner than Ric-Wil. Also, when Ric-Wil and plaintiff came to terms on or about August 16, 1977, there is no evidence that Ric-Wil delayed the deliveries for any cause except for a shortage of all types of fiberglass insulation and allocation of pipe. Delivery delay caused by a shortage of requested materials is an ordinary delay which most contractors anticipate and for which they bid accordingly. Even though Lewis was mistaken as to what the cost of the Ric-Wil pipe would be and that the conflicting contractual provisions precluded a substitution, his conduct was not motivated by evil-mindedness. He simply made mistakes of fact, law and judgment while attempting to insure full and timely performance by plaintiff by insisting that Ric-Wil be used.
Additionally, the evidence does not suggest that he had knowledge that Ric-Wil would be late with the deliveries. It is significant that plaintiff wanted to substitute another supplier for Ric-Wil not because of anticipated delays but, rather, because of its ongoing dispute concerning the 1975 invoice. After Ric-Wil's conditions were accepted by plaintiff, one would expect reasonably that those favorable conditions would motivate Ric-Wil to deliver as early as possible since full payments were to be made at time of delivery, which was not the usual practice. Thus, if Lewis' conduct had any impact at all on the deliveries, it would have been to contribute to early rather than late deliveries.
Based on our analysis of the evidence and review of the controlling legal principles, we hold that plaintiff failed to prove *131 active interference or bad faith. Therefore, the "no delay damage" clause precludes any recovery for the five and one-half months of delay caused by the Ric-Wil delay in deliveries. The trial court's findings on this point "are so wholly insupportable as to result in a denial of justice." Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974). We are completely satisfied that the parties intended for the sweep of the no delay damage clause to include the delays here involved.
Plaintiff was also awarded damages for delays caused by 15 unchartered underground obstacles at the project site. The trial judge found that the parties did not intend the "no delay damage" clause to bar recovery by plaintiff for the delays caused thereby. He also accepted plaintiff's contention that "the extra time required to re-excavate the conduit holes so as to install the Ric-Wil expansion loops (which were delivered late) and to separate the pipes, reattach and retest created an additional one month delay." He found the State liable for the four additional months it took Dobson to install the conduit due to the uncharted obstructions and the installation of the loops.
DOBC argues that the contract "no delay damage" delay clause precludes delay damages caused by the unchartered obstacles. The no delay damage clause must be read in conjunction with the provisions dealing with unchartered obstacles. Paragraph 15B.27 provided:
a.2. Attention is directed to the fact the State was unable to provide an accurate overall topographical and Utility Site Plan. The Mechanical Engineers accordingly assembled the data shown on the drawings from various separate Site Plans, several of which proved to be inaccurate. These were corrected to the best of their ability by site observation and measurement. Every effort has been made to show all known utilities and/or interferences, but this is not guaranteed. Some may not be shown and/or may not be in the indicated locations or at the indicated inverts. Extreme care shall accordingly be exercised by the Contractor in excavations. If unforeseen utilities or interferences are discovered during construction, they shall immediately be directed to the attention of the State and Engineers' representative and a site meeting shall be arranged to resolve the problem and mutually acceptable additional compensation methods, if necessary.
Paragraph 49B provided:
Should the Contractor encounter subsurface and/or latent conditions at the cite materially differing from those shown on the plans or indicated in the specifications, *132 he shall immediately give notice to the Architect of such conditions before they are disturbed. The Architect will thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the plans or indicated in the specifications, he will at once make such changes in the plans and/or specifications as he may find necessary, any increase or decrease of cost resulting from such changes to be adjusted in the manner provided by the General Conditions under Additions, Deductions, Deviation.
Paragraph 18C provided that all claims for extensions of time due to time deviations from the original bid plan
shall be adjusted at the time of ordering such change... and no claim for an addition to the contract sum shall be valid unless so ordered. Should the contractor perform extra work without first obtaining such an order from the Director, such action may be construed by the State as a waiver of any and all claims to extra payment therefor.
The judge found that on the basis of the contract language and surrounding circumstances, the parties did not intend the no delay damages provision to apply to delay damages from uncharted underground obstacles. He reasoned paragraph 15B.27, providing that costs arising from uncharted obstacles could be adjusted as they arose, negated any intent to include them in the coverage of paragraph 12E. We disagree with this interpretation of the contract.
The reasonable and sensible interpretation is that the parties intended that there would be no delay damages even where unchartered obstacles were discovered. When such objects were discovered, the parties intended for the contractor to submit a change order request and the parties would then agree upon the "mutually acceptable additional compensation," if necessary, caused by the uncharted obstacles. Plaintiff submitted change orders due to the uncharted obstacles and was paid for all of the additional actual expenses incurred. Plaintiff was not paid, however, for delay damages. The contract documents clearly alerted plaintiff of possible uncharted obstacles. When plaintiff bidded for the job it undoubtedly reflected the fact of no delay damages for such causes in the bid it submitted. See Broadway Maintenance, supra, 90 N.J. at 270. Consequently, the parties contemplated such delays as ordinary and were intended to fall within the scope of the no delay damage clause.
*133 Because we conclude that the no delay damage clause precludes recovery by plaintiff, we need not reach the other contentions advanced by DOBC as to why the damages awarded were excessive or waived.
Finally, DOBC contends that its counterclaim for liquidated damages for not completing the project on time should not have been dismissed. The trial judge dismissed the counterclaim at the close of the evidence on liability after stating that there was no evidence to support the claim. We have considered the contentions and the arguments advanced to support them in view of the record and find they are clearly without merit. R. 2:11-3(e)(1)(A) and (E). We add only that our careful study of the record does not support DOBC's contention that "the court specifically found that Dobson was liable for a portion of the delay." We are entirely satisfied that the additional 315 days it took beyond the April 12, 1978 anticipated completion date were beyond the contractor's control for which there is no liability in view of paragraph 21E.
The judgment awarding plaintiff delay damages is reversed and judgment is entered dismissing the complaint. In view of our decision reversing the judgment, plaintiff's cross-appeal seeking prejudgment interest becomes moot. The judgment dismissing the counterclaim is affirmed.