848 A.2d 863

CAPITAL SAFETY, INC., PLAINTIFF–APPELLANT, v. STATE OF NEW JERSEY, DIVISION OF BUILDINGS AND CONSTRUCTION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 30, 2004—Decided May 24, 2004.

Before Judges SKILLMAN, WELLS and C.S. FISHER.

*Patrick T. Collins,* argued the cause for appellant (*Franzblau Dratch,* attorneys; *Mr. Collins,* on the brief).

*Thomas H. Shar,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel; *Mr. Shar,* on the brief).

The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

This appeal requires us to construe a "termination for convenience" provision in a State contract.

After competitive bidding, the Division of Building and Construction (DBC)[1] entered into a contract with plaintiff in May

---

[1] After the execution of this contract, the DBC was renamed the Division of Property Management and Construction under a reorganization plan that be-

1996 for removal of asbestos on the first through fourth floors of the Labor Building in Trenton. The amount of the contract was $1.6 million, and the project was required to be completed in 460 days.

Due to safety concerns, the Department of Labor was required to evacuate all personnel and equipment from the entire floor from which asbestos was to be removed before plaintiff could begin work. To enable the Department to continue its operations while the work was performed, the parties agreed that plaintiff would perform the asbestos removal work one floor at a time.

In accordance with this plan, plaintiff started work on the first floor in June 1996 and completed all work on the first and second floors sometime in the second half of 1997. However, the Department encountered difficulty relocating its employees on the other floors to enable plaintiff to complete its work. As a result, the DBC issued an order in October 1997 which directed plaintiff to suspend all work until the Department was able to devise a suitable plan for relocating its employees.

Plaintiff submitted a claim for the damages it had allegedly incurred as a result of the suspension of its work. The parties subsequently engaged in lengthy negotiations concerning plaintiff's claim as well as completion of its performance under the contract.

These negotiations resulted in a supplemental agreement between the DBC and plaintiff, which was executed in January 1999. Under section A of this agreement, the DBC agreed to pay plaintiff $150,000 as "full and complete compensation for all of the Contractor's expenses, losses, claims and/or damages incurred as a result of the Order of Suspension." Section B of the supplemental agreement states in relevant part:

came effective in 1997. Reorganization Plan No. 003–1997, provision 4 (reprinted under *N.J.S.A.* 52:18A–178). Since plaintiff uses the name DBC in the caption to its complaint, we have referred to the contracting agency as the DBC throughout this opinion.

1. In the event the State moves forward with the Project, the State will issue a Dissolution of Order of Suspension simultaneously with a Notice to Proceed....

2. Within 10 days of the Dissolution of Order of Suspension and issuance of the Notice to Proceed, the Contractor shall return to the jobsite and complete the work on the Project, or any portion of work thereof, as determined by the State....

Section C of the supplemental agreement, the section directly implicated in this appeal, which is entitled "Termination for Convenience," states in relevant part:

1. *The State may, at any time, by written order terminate the Contract or any portion thereof for convenience after determining* that for reasons beyond the Contractor's control, the Contractor is or will be unable to proceed with or complete the Project as contracted for, or *that termination is otherwise in the public interest.*

2. Notwithstanding the above paragraph, the State expects to proceed with the Project and to issue the Contractor a Dissolution of Order of Suspension and Notice to Proceed. *The Parties acknowledge that should the State exercise its right to terminate the contract for convenience and should such termination constitute an act of bad faith, the Contractor has not waived its right to pursue a breach of contract action against the State.*

. . . .

9. If the Director orders termination of the Contract for convenience, the State will pay for all completed items of work as of the date of the Order of Termination, at the Contract price or pursuant to any agreed upon change order. *The State shall not pay for specific items or portions of the Project that have been eliminated by the Order for Termination.*

(Emphasis added.)

Pursuant to this supplemental agreement, the DBC issued a notice on April 6, 1999, vacating the suspension order and directing plaintiff to proceed with asbestos removal on the fourth floor of the Labor Building. At that time, the parties anticipated that plaintiff's work on the fourth floor would be completed by November 1999 and that work on the third floor would proceed immediately thereafter. However, the Department of Labor advised the DBC in August 1999 that it was still experiencing difficulty relocating its employees and equipment on the third floor and therefore would be unable to make that floor available when plaintiff completed work on the fourth floor.

After the DBC notified plaintiff of this anticipated further delay, plaintiff submitted a claim for an additional $85,000 in delay damages. The Department subsequently notified the DBC that it

would not be able to make the third floor available for asbestos removal until July 2000 at the earliest. After unsuccessfully attempting to negotiate an agreement limiting plaintiff's claim for additional delay damages, the DBC notified plaintiff on January 6, 2000 that it was exercising its right under the supplemental agreement to terminate the contract "in the public interest, due to the impossibility of performance on the 3rd floor of the Labor Building, arising from the current occupancy of that space."

More than a year later, the DBC entered into a new contract with another contractor for removal of asbestos on the third floor of the Labor Building.

After the DBC terminated the contract, plaintiff brought this breach of contract action. Plaintiff's complaint asserted that the Department's inability to relocate the workers on the third floor and plaintiff's failure to accept the DBC's proposals for additional compensation for the Department's delay in making the third floor available for asbestos removal was not a valid basis for the DBC to invoke the termination for convenience provision of the contract.

After completion of discovery, the case was brought before the trial court by cross-motions for summary judgment. The court concluded that the DBC had not acted in bad faith in exercising its right under the supplemental agreement to terminate the contract for convenience.

> You can talk about bad faith.... What does it mean? Is [it] ineptitude, is [it] poor administration, is [it] generally screwing things up[?]

> The State was in a situation where things were not running as they wanted it to. Things were not running as ... anyone would hope they would under the circumstances and [the] decisions [that] were made.... I specifically do not find were made to injure your client, or were made in bad faith to get some form of advantage over your client in order to obviate the need to continue on with this particular contact.

> . . . .

> And I'm satisfied too that that was one of the things that was anticipated by the parties given the track record up until the point of the execution of the supplemental agreement.

Accordingly, the trial court entered summary judgment dismissing plaintiff's complaint.

The question presented by this appeal is whether the trial court correctly construed the termination for convenience provision of the supplemental agreement as authorization for the DBC to terminate the contract because the Department was unable to relocate the employees on the third floor of the Labor Building. There is no reported opinion in this State construing a termination for convenience provision, apparently because the State did not include such a provision in its standard form contract until recently. However, these provisions have been included in most federal government procurement contracts since the 1960s. See *Krygoski Constr. Co. v. United States,* 94 *F.*3d 1537, 1541 (Fed.Cir.1996), *cert. denied,* 520 *U.S.* 1210, 117 *S.Ct.* 1691, 137 *L.Ed.*2d 819 (1997). Therefore, in construing the termination for convenience provision in the supplemental agreement, it is appropriate to consider the cases that have construed similar provisions in federal contracts. *See Linan–Faye Constr. Co. v. Housing Auth. of Camden,* 49 *F.*3d 915, 921–22 (3d Cir.1995).

The federal courts have broadly construed termination for convenience provisions to authorize termination for any reason that is in the best interests of the government so long as the contracting agency does not act in bad faith. *See, e.g., Am–Pro Protective Agency v. United States,* 281 *F.*3d 1234, 1238–42 (Fed.Cir.2002); *T & M Distribs., Inc. v. United States,* 185 *F.*3d 1279, 1283 (Fed.Cir. 1999); *Krygoski Constr. Co., supra,* 94 *F.*3d at 1541; *Caldwell & Santmyer, Inc. v. Glickman,* 55 *F.*3d 1578, 1581–82 (Fed.Cir.1995); *Salsbury Indus. v. United States,* 905 *F.*2d 1518, 1520–22 (Fed.Cir. 1990), *cert. denied,* 498 *U.S.* 1024, 111 *S.Ct.* 671, 112 *L.Ed.*2d 664 (1991). "Mere error on the part of the Government, even if it would constitute sufficient ground for contractual breach were the termination clause inapplicable, is insufficient to overcome the presumption of regularity inherent in the invocation of the termination for convenience." *Kalvar Corp. v. United States,* 211 *Ct.Cl.* 192, 543 *F.*2d 1298, 1303 (1976), *cert. denied,* 434 *U.S.* 830, 98 *S.Ct.* 112, 54 *L.Ed.*2d 89 (1977). In fact, the federal courts have indicated that "[i]n the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclu-

sive." *Salsbury Indus., supra,* 905 *F.*2d at 1521 (quoting *John Reiner & Co. v. United States,* 163 *Ct.Cl.* 381, 325 *F.*2d 438, 442 (1963)); *accord T & M Distribs.,* 185 *F.*3d at 1283; *Krygoski Constr. Co., supra,* 94 *F.*3d at 1543.

The federal courts have also held that "[t]he contractors' burden to prove the Government acted in bad faith . . . is very weighty." *Krygoski Constr. Co., supra,* 94 *F.*3d at 1541. "[G]overnment officials are presumed to act in good faith, and 'it requires well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing.'" *T & M Distribs., supra,* 185 *F.*3d at 1285 (quoting *Kalvar, supra,* 543 *F.*2d at 1301–02); *accord Am–Pro Protective Agency, supra,* 281 *F.*3d at 1239. "[T]he requirement of 'well-nigh irrefragable' proof . . . sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith[.]" *Am–Pro Protective Agency, supra,* 281 *F.*3d at 1240. This standard has been "equated with evidence of some specific intent to injure the plaintiff." *Ibid.* (quoting *Kalvar, supra,* 543 *F.*2d at 1302). Consequently, "an ordinary business decision" made for the purpose of saving the government money does not provide a basis for a finding of bad faith. *Id.* at 1242. "Due to this heavy burden of proof, contractors have rarely succeeded in demonstrating the Government's bad faith." *Krygoski Constr. Co., supra,* 94 *F.*3d at 1541.

■ Our Supreme Court has also recognized that if a breach of contract claim requires a showing of bad faith, a party may not be held liable for simply exercising its discretionary authority under the contract for "ordinary business purposes—reasonably within the contemplation of the parties." *Wilson v. Amerada Hess Corp.,* 168 *N.J.* 236, 246, 773 *A.*2d 1121, 1127 (2001). To show bad faith, the claimant must establish that the alleged breaching party had an "improper motive." *Id.* at 251, 773 *A.*2d at 1130. "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." *Ibid.*

■   The supplemental agreement authorized the DBC to "terminate the Contract or any portion thereof for convenience after determining . . . that termination is . . . in the public interest." Moreover, the supplemental agreement authorized such termination "at any time." The only limitation upon the DBC's authority to unilaterally terminate the contract was the stipulation that it could not exercise this authority in "bad faith."

The undisputed facts show that the DBC terminated the contract for business reasons that were within the contemplation of the parties when they executed the supplemental agreement in January 1999. At that time, plaintiff's performance of its work had been delayed for more than a year, and plaintiff had asserted a claim for delay damages that was settled for $150,000. Moreover, section B of the supplemental agreement indicates that the DBC was still uncertain whether it would be able to authorize plaintiff to resume performance and, if such authorization was given, whether it would extend to the entire scope of work contemplated by the original contract. Section B provides in pertinent part:

1. *In the event the State moves forward with the Project,* the State will issue a Dissolution of Order of Suspension simultaneously with a Notice to Proceed. . . .

2. Within 10 days of this Dissolution of Order of Suspension and issuance of the Notice to Proceed, the Contractor shall return to the jobsite and complete the work of the Project, *or any portion of work thereof,* as determined by the State and as set forth in the Notice to Proceed. . . .

. . . .

5. . . . [I]n the event the State does not dissolve its Order of Suspension on or before February 14, 1999, the State will pay the Contractor $200 for each work day between February 15, 1999 through April 1, 1999 that the Contractor is unable to work on the Project, up to and including the day the State issues the Dissolution of Order of Suspension and Notice to Proceed, or an Order of Termination as set forth under Part C [the termination for convenience provision]. After April 1, 1999, the State agrees to pay the Contractor $500 for each work day that the Contractor is unable to work on the Project, up to and including the day the State issues the Dissolution of Order of Suspension and Notice to Proceed, or an Order of Termination as set forth under Part C. . . .

Thus, even though the DBC expected when it executed the supplemental agreement that the project would proceed, it preserved its right to terminate the contract without the payment of

additional damages. In addition, the supplemental agreement provided that if the State did not terminate the contract on or before February 14, 1999, but failed to issue a notice to proceed because it was unable to provide access to the work site, it would pay plaintiff liquidated damages for each work day up to the date of issuance of a notice to proceed or order of termination. The supplemental agreement also preserved the DBC's right to issue a notice to proceed with respect to "any portion of [the] work." Therefore, it is clear the DBC had lingering uncertainty concerning its ability to provide timely access to the work site when it executed the supplemental agreement, and the parties addressed this uncertainty by providing a specific schedule of liquidated damages for any delay as well as preserving the DBC's right to terminate the contract "at any time."

Under these circumstances, there is no basis for concluding that the DBC's decision to terminate the contract for convenience in the public interest was made in bad faith. The DBC's inability to provide plaintiff access to the third floor of the Labor Building due to the Department's inability to relocate its employees and equipment was one of the contingencies—indeed probably the primary contingency—that the parties had in mind when they included the termination for convenience provision in the supplemental agreement. Before the DBC terminated the contract, plaintiff had made a settlement offer under which the State would have been required to pay plaintiff $20,000 for costs of "demobilization" plus an unspecified additional amount of delay damages for "remobilization." Thus, if the DBC had not invoked the termination for convenience provision, it would have been exposed to an open-ended and potentially very substantial claim for delay damages.

Plaintiff does not suggest that the DBC had any motive for terminating the contract other than to avoid the State's exposure to such a claim. Plaintiff simply alleges that the Department was derelict in failing to make arrangements for relocation of the employees and equipment on the third floor due to concerns about plans for consolidation of its print shop operations located on that

floor with similar operations conducted by the Department of Treasury, which would have made relocation of the print shop unnecessary. However, such circumstances do not provide a foundation for a finding of bad faith. In fact, this was the same type of circumstance that had caused the previous interruption in plaintiff's performance of the contract. Therefore, even viewing the evidence most favorably to plaintiff, the DBC cannot be found to have acted in bad faith because its motive in terminating the contract was not to harm plaintiff but instead to serve the financial interests of the State by avoiding exposure to a claim for additional delay damages. *See Am–Pro Protective Agency, supra,* 281 *F.*3d at 1241–42.

We also note that in view of the continuing uncertainty regarding the Department's ability to provide timely access to the work site, the DBC could have negotiated for inclusion of a "no damage for delay" clause in the supplemental agreement rather than the termination for convenience provision at issue in this appeal. Our Supreme Court has held that such "[n]o-damage [for delay] provisions are a part of the economic package upon which the parties agree" and should be enforced unless there is a showing of unconscionability or bad faith. *Broadway Maint. Corp. v. Rutgers,* 90 *N.J.* 253, 270, 447 *A.*2d 906, 914 (1982). The Court also has recognized that "[t]he very purpose of [a "no damages for delay"] clause [is] to avoid ... exposure" to a claim for damages even for a delay that could be found to be unreasonable. *Id.* at 270–71, 447 *A.*2d at 915. Therefore, a "no damages for delay" clause will be enforced even if a contractor's performance is delayed as a result of a government contracting agency's "error in judgment, lack of total effort, or lack of complete diligence...." *Edwin J. Dobson, Jr., Inc. v. State,* 218 *N.J.Super.* 123, 128–29, 526 *A.*2d 1150, 1153 (App.Div.1987) (quoting *Peter Kiewit Sons' Co. v. Iowa S. Utils. Co.,* 355 *F.Supp.* 376, 399 (S.D.Iowa 1973)). A "termination for convenience" provision should be construed similarly to authorize termination of a contract even though the

occasion for invoking this right is a government agency's unreasonable delay in providing the contractor access to the work site.

Affirmed.