**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0778-14T4
            A-0842-14T4

CITY OF PERTH AMBOY,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

INTERSTATE INDUSTRIAL CORP.,

    Defendant-Respondent/
    Cross-Appellant,
and

XL SPECIALTY INSURANCE COMPANY
and S.M. ELECTRIC COMPANY, INC.,

    Defendants,
and

TAK CONSTRUCTION, INC.,
SAFECO INSURANCE COMPANY
OF AMERICA,

    Defendants-Appellants/
    Cross-Respondents,
and

XL SPECIALTY INSURANCE COMPANY,

    Third-Party-Plaintiff,

v.

IMPERIAL CONSTRUCTION GROUP,

INC.,

    Third-Party-
    Defendant-Respondent,

and

MICHAEL ZEMSKY, A.I.A.,
ARCHITECTS AND PLANNERS,

    Third-Party Defendants.

_____

Argued November 29, 2016 — Decided May 17, 2017

Before Judges Messano, Espinosa and Guadagno.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket Nos. L-2745-06, L-3789-07 and L-7861-07.

Benjamin D. Lentz argued the cause for appellant/cross-respondent Safeco Insurance Company of America (Torre, Lentz, Gamell, Gary & Rittmaster, L.L.P., attorneys; Kevin M. Gary, on the briefs).

Geoffrey J. Hill argued the cause for appellant/cross-respondent TAK Construction, Inc. (Law Offices of Steve M. Kalebic, P.C., attorneys; Steve M. Kalebic, of counsel and on the briefs).

Timothy D. Cedrone argued the cause for respondent/cross-appellant City of Perth Amboy (Apruzzese, McDermott, Mastro & Murphy, attorneys; Mark J. Blunda, of counsel and on the brief; Mr. Cedrone, on the briefs).

Robert S. Cosgrove argued the cause for respondent/cross-appellant Interstate Industrial Corp. (Durkin & Durkin, L.L.P., attorneys; Mr. Cosgrove, on the briefs).

James J. Ross argued the cause for respondent Imperial Construction Group, Inc. (Carroll, McNulty & Kull, L.L.C., attorneys; Joseph P. McNulty, of counsel and on the brief; Mr. Ross, of counsel and on the brief; Michael S. Kerr, on the brief).

PER CURIAM

These consolidated appeals arise from the construction of a municipal complex in the City of Perth Amboy (the City). The project envisioned a free-standing building housing the fire department and emergency medical services (the first building), and a second building containing the public safety department, municipal court and community center, which included swimming pools and a gymnasium. The City intended to expedite completion of the project within one year. It decided not to hire a general contractor, but rather have its business administrator serve as project manager and contemporaneously award contracts to a number of prime contractors. The process was delayed, and the City opted to begin awarding contracts seriatim, even though, in some instances, plans and specifications were not complete.

The City awarded multiple contracts, including those to: Michael Zemsky, A.I.A., Architects & Planners (Zemsky), for architectural services; Imperial Construction Group (Imperial), for construction management; Interstate Industrial Corp. (Interstate), for concrete work; and TAK Construction Co. (TAK),

the largest contract — $19.774 million — for general construction. Safeco Insurance Company of America (Safeco) was TAK's surety, and XL Specialty Insurance Company (XL) was Interstate's surety.

Zemsky was to supply "normal" structural, mechanical and electrical "engineering services" for all project phases, from design through construction. He was required to prepare all design and construction drawings and specifications.

Imperial was the project's construction manager, with responsibility to monitor the quality of contractor work and coordinate all work and other activity. It was to review change orders, make recommendations to the City and Zemsky, and negotiate final terms with the contractors. Imperial was charged with "immediately causing the remediation of any incorrect work," and notifying the City and Zemsky of such deviations or other deficiencies, as well as "any situation" that might increase the project's cost or delay its completion.

The contract with Interstate included a time of the essence provision that subjected the company to per diem liquidated damages if Interstate did not finish on time. Interstate was subject to Imperial's direction about the sequencing of work, but Imperial had no authority over Interstate's "means, methods, techniques, sequences or procedures of construction."

The contract specified that additional time for completion was Interstate's only relief against the City, Zemsky, or Imperial for the effect of any "delay, obstruction or hindrance for any act or omission of" those parties or other contractors, including changes in work schedules or sequencing. Additionally, the contract allowed the City, at its convenience, to terminate Interstate "for any reason" upon seven days' written notice. The City could also terminate Interstate for cause within forty-eight hours of its failure to begin whatever corrective measures Imperial might demand in order to cure or mitigate insufficient progress or other defaults on Interstate's contractual obligations. Those other defaults included the failure to furnish sufficient skilled labor or, "in the sole opinion of" Imperial, "in any respect to prosecute the work, to insure its completion in the manner and within the time determined by [Imperial] or the [City]."

The contract with TAK included identical provisions permitting termination for convenience and for cause, as well as time of the essence and liquidated damages provisions. TAK was to "furnish all labor, materials, equipment, tools and services necessary to perform and complete the Project in strict compliance with the Contract Documents." That included the bulk of construction work following site preparation, except for work done by other contractors providing structural steel, concrete building

foundations and floor slabs, climate control, plumbing, general electrical work, and the alarm and building management systems, all of which TAK was responsible for coordinating as "project coordinator," subject nonetheless to Imperial's direction.

As with Interstate, Imperial would decide questions about the timelines of TAK's work and satisfaction of its contractual obligations, and Imperial had no authority over TAK's means or methods of performance. TAK also waived delay damages for any additional costs that arose from Imperial's direction and acknowledged an extension of time would be its sole remedy against the City, Zemsky, or Imperial for delays that resulted from their negligence or that of another contractor.

The project rapidly fell behind schedule. The City held TAK responsible for the delays, and the parties mediated their dispute. In October 2006, TAK and the City executed a memorandum of understanding (MOU), also designated as a stipulation of settlement. The MOU was "a supplement to" TAK's contract and stated that, "[e]xcept as set forth herein, all other terms and conditions of [TAK's] Contract remain[ed] in full force and effect." The MOU set October 31, 2006, as the date for substantial completion of the first building, and May 15, 2007, as the completion date for the second building. As to each building, the City agreed to pay additional sums as "change orders," subject to

6

the right to impose penalties upon TAK for failure to meet completion dates.

Although TAK substantially completed the first building in December 2006, disputes over TAK's performance regarding the second building continued. On March 26, 2007, Imperial sent TAK the forty-eight-hour notice required by the contract before any take-over of TAK's work. It cited scheduling failures and advised TAK that the City was taking control of unspecified "portions" of TAK's obligations. It instructed TAK "to increase [its] work force, work hours [and] workdays" and "to work two shifts."

TAK responded the same day, asserting that any delays were beyond its control and caused by delays and errors of other prime contractors, design changes, and delayed responses to TAK's requests for "decisions, approvals, and answers to" requests for information. Additional disputes arose over the payment of TAK's invoices. In May, TAK notified Imperial that the City was in "material breach" of the contract for failing to pay requisitions for work TAK completed earlier in the year.

On May 16, 2007, Imperial sent TAK a notice listing ten specific grounds of default. The letter stated that TAK would be terminated "[i]f [it] fail[ed] to correct this default within the next seven days." TAK responded by asserting its work was adequate and any delays were caused by other contractors. The City

terminated the contract with TAK on May 23, 2007. Safeco assumed TAK's contractual responsibilities in June and completed the project.

More problems arose regarding the second building, particularly as to a trench drain for the proposed pool deck area. Imperial believed Interstate had clearly indicated its intention to mobilize and address the issue, but Interstate adamantly indicated that Imperial had not supplied necessary documentation and specifications to address an admittedly plain design error in Zemsky's plans.

On September 23, 2008, Imperial sent Interstate written notice of default for its alleged failure "to mobilize and schedule labor and material as required to proceed with the installation of rebar and concrete in order to complete the pool deck area." The letter gave Interstate seven days to cure the default to avoid being terminated on September 30. Nonetheless, at a project meeting held on September 25, the City's representatives told Interstate's representatives the company had been terminated. Another contractor finished Interstate's remaining work and was paid $43,000.

The City filed the first action in the Law Division against Interstate, seeking a declaration that Interstate was not entitled to delay damages. Interstate answered and asserted a counterclaim

for wrongful termination and damages. In the second action, TAK filed a complaint in lieu of prerogative writs challenging the City's termination of its contract. As expected, the parties asserted cross-claims and counterclaims against each other, and other contractors and sub-contractors were added to the suits, which were then consolidated.[1]

The judge dismissed certain claims asserted by TAK and Interstate against Imperial on summary judgment. The bench trial began in March 2014, with the only remaining parties being the City, Interstate, TAK and Safeco, plus Imperial on the City's claim for indemnification. The testimony did not conclude until June.

In a comprehensive written opinion, which we discuss more fully below, the trial judge reviewed the evidence. As summarized in his June 30, 2014 order for judgment, the judge concluded the City properly terminated the contract with TAK, but its termination of Interstate's contract was for the City's convenience and not because of Interstate's default. The judge further determined the City suffered no delay damages from TAK's failure to perform because of Zemsky's "concurrent delay in . . . redesigning the

---

[1] A third action, brought by the electrical contractor, S.M. Electric Company, Inc., was also consolidated with the other two, but, prior to trial, all claims by all parties involving S.M. Electric were dismissed by stipulation.

trench drain and the pool deck structural slab . . . ." He concluded, however, the City suffered damages from "Interstate's failure to provide certain work in compliance with the contract . . . ."

The judge determined Safeco was entitled only to the "full contract balance," concluding Safeco was "barred by the . . . the Contract . . . from asserting damages for . . . delays . . . ." He also found TAK was not entitled to any damages, and Interstate failed to prove "it suffered measurable damages as a result of the City's termination of its contract for default rather than convenience." Lastly, the judge concluded the City failed to prove that Imperial breached its contract.

The court entered final judgment for $221,074.41 in favor of the City against Interstate, ordering an offset for the amount of the settlement the City reached with XL. It also entered judgment for Safeco for $927,547.38 against the City. The court entered judgments of no cause on Safeco's counterclaim for improper termination of TAK and delay damages against the City, and on TAK's and Interstate's counterclaims and cross-claims. The court dismissed all other claims, and subsequently denied Safeco's and TAK's motions for reconsideration.

In A-778-14, Safeco argues that, for various reasons, the court erred in concluding the City legally terminated TAK's

contract. It also contends that even if termination was proper, the judge should have awarded pre-judgment interest on the contract balance and delay damages, despite the contract's exculpatory clause.

In A-842-14, TAK argues its termination was improper for a number of reasons. Interstate cross-appeals, arguing the City terminated its contract wrongfully and in bad faith, the exculpatory clause is unenforceable and it is entitled to delay damages. Interstate also argues the judge erred by granting summary judgment to Imperial on Interstate's indemnification claim. The City filed a defensive cross-appeal, arguing its indemnification claims against Imperial should survive in the event we grant relief to Safeco, TAK or Interstate.

We have considered these arguments in light of the record and applicable legal standards. We affirm.

I.

We set forth the standards that guide our consideration of the issues raised on appeal. "We review the trial court's determinations, premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). "[W]e do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so

manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice . . . ." Ibid. (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

"[W]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, L.L.C. v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). "To the extent that the trial court's decision constitutes a legal determination, we review it de novo." D'Agostino, supra, 216 N.J. at 182 (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

With these standards in mind, we first address the substantive arguments raised by Safeco and TAK.

II.

In his written opinion, the trial judge found that Imperial repeatedly warned TAK that its performance was deficient. The judge noted that in September 2006, Imperial recommended the City terminate TAK because it failed to complete tasks on schedule, and it "would not and could not reasonably fulfill [its] obligations in the near future." Instead, the City negotiated the MOU with TAK, but "neglected to include any of the other prime contractors in the negotiating process."

The judge found that in November 2006, Imperial attempted to bring together all the prime contractors with responsibilities for the pool area in an attempt to reach the May 2007 target completion date for the second building. The judge found, "this was not Imperial's responsibility; it was TAK's." The judge also concluded that beginning in January 2007, Imperial began notifying TAK of its obligations to submit shop drawings and schedules to meet the May deadline, and in March, Imperial directed TAK to increase its work force and hours. The judge detailed the numerous inadequacies Imperial found in TAK's performance and manpower commitment during April 2007.

The judge reviewed the contract's termination provisions and the ten reasons listed in the May 16, 2007 notice of termination. The judge found "this notice is the culmination of a series of notices all related to [Imperial's] opinion, expressed in writing and in meeting minutes, that TAK [was] not manning, scheduling or coordinating the work properly." He concluded, "the notice comports with the procedural requirements of the contract . . . . There is nothing in the evidence to support any notion that TAK attempted to cure the ongoing issues, or provide a detailed response to evidence a cure."

The judge also found that the MOU did not "preclude the City from exercising its right of termination for cause." He noted

13                                                    A-0778-14T4

that the City based the termination on more than TAK's inability to complete the second building by May 15, 2007.

The judge also rejected Safeco's and TAK's claim that the termination was improper because delays attributable to TAK were not on the "critical path" to the project's completion. The judge found "the parties had evidenced a clear intention that the completion of the disparate areas of the [second] building was to be sequenced." He cited testimony from "multiple witnesses . . . that the City urgently wanted beneficial use of the police area first, the courthouse second, and the recreational area last."

The judge found "other parties [in addition to TAK] bear responsibility for the project being abysmally behind schedule." However, he specifically noted TAK's failure to challenge Imperial's "litany of over thirty pieces of correspondence detailing the lack of manpower, coordination and scheduling needed to move the project . . . ." In detailed fact-finding implicitly rejecting the credibility of TAK's principal and expressly rejecting TAK's expert's testimony, the judge found the City properly terminated TAK for failure to employ sufficient skilled craftsmen and complete the project in a timely manner; TAK failed to make timely submittals for stone work, which denied the City "beneficial use of the police and court . . . areas"; and TAK failed to "schedule and coordinate all activities at the site."

14

The judge addressed Safeco's claims, finding it was entitled to the "full contract balance due and owing," $927,547.38. Based on his earlier findings, he rejected any damages for the City's "improper termination" of TAK. The judge then addressed Safeco's "own claim for delay damages based on the time for completion as the completing contractor . . . ." The judge concluded that TAK, Interstate and Zemsky all played a part in causing the delays, but the exculpatory clause "extend[ed] the protections sought for the benefit of the City to the negligence of its retained professionals."

## A.

Safeco and TAK both argue that termination was improper because TAK's remaining work at the time was not on the "critical path" for completion of the project. Safeco claims that delays in work not on the critical path are not sufficiently material to justify the severe remedy of termination. It also argues that the judge constructed other "critical paths" that never existed by concluding, contrary to the contract and the MOU, that the second building was to be completed in stages. We reject these arguments without extensive discussion. R. 2:11-3(e)(1)(E).

Safeco and TAK cite a number of federal precedents for support. See Decker & Co. v. West, 76 F.3d 1573, 1580 (Fed. Cir. 1996); Devito v. United States, 413 F.2d 1147, 1153 (Ct. Cl. 1969);

J.D. Hedin Constr. Co. v. United States, 408 F.2d 424, 431 (Ct. Cl. 1969); Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 75, 92 (1992).  While these cases hold termination is akin to a forfeiture and should not be imposed lightly, they do not hold that delay in work off a critical path can never justify termination.  Rather, the decisions may be summarized as holding critical path analysis to be  useful in determining delay damages. See G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 728 (1984) ("The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path had an impact upon the time in which the project was completed." (emphasis added)).

Only a handful of published cases from our courts even discuss the concept of critical path scheduling.  See, e.g., P.T. & L. Constr. v. State, Dep't of Transp., 108 N.J. 539, 544 (1987); Broadway Maint. Corp. v. Rutgers, State Univ., 90 N.J. 253, 261 (1982); Utica Mut. Ins. Co. v. DiDonato, 187 N.J. Super. 30, 34 (App. Div. 1982); Am. Sanitary Sales Co. v. State, Dep't of Treas., 178 N.J. Super. 429, 433-34 (App. Div.), certif. denied, 87 N.J. 420 (1981); Edwin J. Dobson, Jr., Inc. v. Rutgers, State Univ., 157 N.J. Super. 357, 367-68 (Law Div. 1978), aff'd sub nom. Broadway Maint. Corp. v. Rutgers, State Univ., 180 N.J. Super. 350 (App. Div. 1981), aff'd, 90 N.J. 253 (1982); Buckley & Co. v.

16

State, 140 N.J. Super. 289, 294 (Law Div. 1975). None of them support the proposition that a contract cannot be terminated unless there is delay to work on the critical path to completion.

B.

Safeco contends there was no evidence that TAK's alleged failure to provide sufficient manpower actually delayed completion of the public safety and municipal court sections of the second building for the City's "beneficial use," and the judge effectively "re-wrote" the contract by ignoring the intended unitary nature of the project. It contends Zemsky and others caused the delays, which continued even after Safeco assumed the work. Finally, Safeco claims the judge ignored the City's failure to give TAK forty-eight hours to cure defaults. TAK makes similar arguments, stating there was no basis for the judge to conclude the parties intended the second building be delivered in piecemeal fashion.[2]

---

[2] TAK also argues that, during the City's earlier motion for partial summary judgment, the judge concluded the contract was a unitary contract and rejected the City's argument that there were differing completion dates for the second building. We have only the transcript of the argument, but, in any event, an interlocutory "order denying summary judgment . . . decides nothing and merely reserves issues for future disposition." Gonzalez v. Ideal Tile Importing Co., Inc., 371 N.J. Super. 349, 356 (App. Div. 2004), aff'd, 184 N.J. 415 (2005), cert. denied sub nom. Gonzalez v. Komatsu Forklift, U.S.A., Inc., 546 U.S. 1092, 126 S. Ct. 1042, 163 L. Ed. 2d 857 (2006).

In essence, these arguments require us to reject the judge's factual findings, which we refuse to do. The evidence demonstrates TAK acknowledged the anticipated delivery of the public safety and court portions of the second building would precede the troubled pool deck area. On June 28, 2006, TAK sent Imperial a schedule and sequencing update for the entire project. TAK noted this comported with Imperial's request to bifurcate the work on the second building, with separate completion dates "to meet the Owner's recently desired priorities of the Police and Court areas followed by the Recreation [portion's] Daycare, Gymnasium, and Pool areas." Each of the more than 350 items in the update had its own schedule and completion date, with final completion projected for March 27, 2007, and a certificate of occupancy to be issued on April 10, 2007. This alone supports the judge's conclusion that the parties anticipated the City's earlier beneficial use of the public safety and municipal court portions of the second building.

As to TAK's failure to supply adequate skilled labor, the judge relied on Imperial's repeated and specific requests in March and April 2007, particularly in areas where there would be no disruption of ongoing work or its completion. To the extent we have not specifically addressed Safeco's and TAK's other claims

A-0778-14T4

in this regard, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Safeco also contends the judge found a basis for termination that the City never asserted, namely, TAK's alleged failure to coordinate the work of other prime contractors. However, the City's notice of termination cited TAK's breach of various articles of the contract, including Article VIII, which placed upon Imperial the obligation to settle "all questions concerning the acceptable fulfillment of the Contract by [TAK]." In its contract, TAK was the designated "project coordinator" with responsibility to "[p]rovide overall coordination of the [w]ork of all other [c]ontractors." The judge cited the cumulative effect of TAK's failure to coordinate and schedule the work of other prime and subcontractors.

Safeco and TAK argue the judge erred in concluding TAK's delay in furnishing certain stone samples caused a significant delay in the public safety and municipal court portions of the second building. TAK also argues that the judge's finding that Zemsky was negligent precluded the conclusion that TAK materially breached the contract, and it also contends that, under the terms of the MOU, the City's remedy was limited to liquidated damages. These arguments lack sufficient merit to warrant extensive discussion. R. 2:11-3(e)(1)(E).

The judge did not find that TAK's delay in submitting samples was a breach. Rather, the judge noted Imperial's concern that TAK was not taking into account the long lead time for the stone materials to arrive once ordered. In any event, for the reasons already stated, there was sufficient, credible evidence in the record to support the judge's conclusion that delays attributable to TAK's breaches justified its termination.

We construe the legal import of the MOU de novo. See e.g., Fastenberg v. Prudential Ins. Co. of Am., 309 N.J. Super. 415, 420 (App. Div. 1998) ("Interpretation and construction of a contract is [sic] a matter of law for the court subject to de novo review."). By its express terms, the MOU supplemented the original agreement and expressly continued the contract's other terms. We reject TAK's argument that the MOU modified them.

Lastly, TAK cites no authority for the proposition that other concurrent causes for delay barred the City's right to terminate the contract. We have not recognized such an "all-or-nothing" approach and, instead, have held that even as between owner and contractor, the appropriate solution is an apportionment of damages occasioned by concurrent delays. Am. Sanitary Sales, supra, 178 N.J. Super. at 434.

Safeco and TAK also argue the judge did not consider that the City's failure to pay TAK's early-2007 requisitions was a material breach barring the City from declaring TAK's default. TAK additionally argues the failure to pay evinces the City's bad faith. The City contends TAK was not "entitled" to payment of the submitted requisitions in spring 2007, nor was it permitted by the contract to delay or withhold required performance over disputes about payment. We agree with the City.

"When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement." Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (citing Stamato & Co. v. Borough of Lodi, 4 N.J. 14 (1950)). Failure to pay may be a material breach under the common law even if the contract fails to name it as a ground of default and termination. Ingrassia Constr. Co. v. Vernon Twp. Bd. of Educ., 345 N.J. Super. 130, 136-37 (App. Div. 2001). If the shortcomings in a contractor's work are not significant enough to justify withholding payment, then the owner's failure to make payments as required is such a breach. Zulla Steel, Inc. v. A & M Gregos, Inc., 174 N.J. Super. 124, 131 (App. Div. 1980). However, a statement by the contractor of its "implied . . . willingness to resume service upon payment . . . waive[s] the materiality of the

breach." Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 287 (App. Div. 1998).

Although the judge did not address the issue directly, he specifically rejected TAK's claim that the City had earlier delayed payments because of political reasons, noting the evidence revealed TAK received its payments at that time without delay. The unpaid requisitions TAK asserted as evidence of the City's material breach were the subject of significant controversy at trial.

For example, Zemsky suggested checks be drawn but not tendered, citing pages of inadequacies in TAK's submissions. TAK's principal testified that despite serving the May 15, 2007 letter alleging the City's breach for non-payment, the company continued to pay subcontractors so as not to slow the completion of TAK's work. Imperial's representative testified at trial that, despite TAK's claim, the items requisitioned for payment were incomplete, there was still work TAK needed to do and some of it was unaffected by disputes with other prime contractors. In short, there was substantial, credible evidence in the record to support the judge's implicit conclusion that the City's failure to pay previously requisitioned work was not a material breach of the contract and did not foreclose the City from legally terminating TAK's contract.

We also reject TAK's assertion of bad faith by the City. As Judge Skillman wrote, "To show bad faith, the claimant must establish that the alleged breaching party had an 'improper motive.'" Capital Safety, Inc. v. State, Div. of Bldgs. & Constr., 369 N.J. Super. 295, 301 (App. Div. 2004) (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001)). The judge clearly rejected any claim that the City acted in bad faith, and the record evidence provides no reason to conclude otherwise.

D.

Safeco contends the judge erred in denying pre-judgment interest on the damage award. The judge did not address the issue in the order for judgment or in his written opinion. The judge's September 19, 2014 order that denied Safeco's motion for reconsideration also denied pre-judgment interest.

The City correctly notes that Safeco did not include that order in its notice of appeal, and only orders included in the notice of appeal are subject to our review. 30 River Court E. Urban Renewal Co. v. Capograsso, 383 N.J. Super. 470, 473-74 (App. Div. 2006).[3] Safeco counters by stating in its reply brief that a demand for pre-judgment interest was "inherent in its claim for the contract balance."

_____

[3] TAK included the order denying reconsideration in its notice of appeal.

23                                    A-0778-14T4

"Although prejudgment interest in a tort action is expressly governed by R. 4:42-11(b), 'the award of prejudgment interest on contract and equitable claims is based on equitable principles.'" Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009) (quoting Cty. of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006)). "Thus the award of prejudgment interest in a contract case is within the sound discretion of the trial court." Ibid.

Here, the sparse record hampers our ability to review Safeco's contention. Safeco did not raise the issue in its post-trial/pre-judgment brief, which is in the appellate record, and the issue was not raised at oral argument on Safeco's motion for reconsideration. In short, there is no basis for us to conclude Safeco ever argued the point, much less that the judge mistakenly exercised his discretion by denying pre-judgment interest.

### III.

Turning to the issues raised in its cross-appeal, the judge found that Interstate was "one of the first contractors to begin its work," was given a one-hundred day timetable for completion and rightly assumed "other prime contracts would be issued contemporaneous with its contract." By January 2005, Interstate had completed most of its work on the first building and signaled an intention to demobilize for lack of work. Interstate completed most of its work on the second building before it became apparent,

in fall 2005, that Zemsky's design specifications were wrong, and the flooring subcontractors could not make their installations upon the concrete slabs Interstate poured. The judge concluded other design flaws were discovered when Interstate mobilized to work at the pool deck area.

The judge considered the four grounds for termination in Imperial's September 2008 notice. He concluded the City failed to demonstrate it paid Safeco or other contractors to remediate Interstate's unsatisfactory work after termination. Instead, any additional work was "necessary to harmonize the discrepancies in the tolerances inherent in the contract documents." The judge also concluded the City failed to permit Interstate to cure any alleged defaults, and therefore, the "termination . . . was not for cause."

Instead, he construed the termination as one for the City's convenience, and, pursuant to the contract, Interstate was entitled to "compensation 'for . . . authorized services rendered . . . up to that date, and for all reasonable shutdown costs as agreed to by both parties.'" The judge found it was undisputed that the contract's unpaid balance was $43,000, and "the remaining work . . . exceeded this amount." The judge concluded Interstate's other damage claims were speculative.

25

In its cross-appeal, Interstate claims the judge erred by concluding the City properly terminated the contract for convenience. It argues the City's attempted termination for cause evidenced bad faith, entitling Interstate to delay damages, despite the exculpatory clause in the contract.[4]

We have followed the decisions of federal courts, which "have broadly construed termination for convenience provisions to authorize termination for any reason that is in the best interests of the government so long as the contracting agency does not act in bad faith." Capital Safety, supra, 369 N.J. Super. at 300 (citations omitted). "Mere error on the part of the Government, even if it would constitute sufficient ground for contractual breach were the termination clause inapplicable, is insufficient to overcome the presumption of regularity inherent in the invocation of the termination for convenience." Ibid. (quoting Kalvar Corp. v. United States, 543 F.2d 1298, 1303 (Ct. Cl. 1976), cert. denied, 434 U.S. 830, 98 S. Ct. 112, 54 L. Ed. 2d 89 (1977)). The contractor's burden to prove bad faith is "very weighty." Id. at 301 (quoting Krygoski Constr. Co. v. United States, 94 F.3d

---

[4] The judge's opinion did not explain in any detail the reasons for, or calculation of, the judgment of $221,071.41 in favor of the City, subject to an offset for the amount of the City's settlement with XL. However, Interstate has not appealed from that portion of the judgment.

1537, 1541 (Fed. Cir. 1996), cert. denied, 520 U.S. 1210, 117 S. Ct. 1691, 137 L. Ed. 2d 819 (1997)).

Interstate does not challenge the City's ability to terminate the contract for convenience. Rather, it contends the City's attempted termination for cause, as well as other conduct, demonstrates the City intended to make Interstate a "scapegoat" for delays occasioned by others. Interstate argues it proved the City acted in bad faith.

The circumstances are unusual in that, even at trial, the City argued it properly terminated Interstate for cause. The judge rejected that argument and concluded the termination was properly for the City's convenience. In any event, the judge entered judgment for the City against Interstate, and Interstate has not challenged that portion of the judgment on appeal. Implicit in that finding was the judge's rejection of any claim that the City acted in bad faith. Moreover, in addressing the impact of the exculpatory clauses, the judge explicitly found the City did not act in bad faith. We therefore reject Interstate's argument the termination for convenience was improper.

Interstate also contends the judge erred by dismissing its cross-claim against Imperial on summary judgment. Interstate argues it was an intended third-party beneficiary of Imperial's contract, and Imperial's contractual duties of proper management

and coordination of the project flowed to Interstate as well as to the City. Interstate contends the web of contracts for the project gave Imperial an enforceable duty to supervise, manage, and coordinate the project. We disagree.

In granting Imperial summary judgment, the judge reasoned the various contracts made clear that Imperial did not have "any authority or any responsibility for means, methods, sequences procedures. And [it was] not . . . responsible for it." Under the circumstances, the judge concluded none of the prime contractors had a cause of action against Imperial as implied third-party beneficiaries of Imperial's contract with the City.

"The principle that determines the existence of a third party beneficiary status focuses on whether the parties to the contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement." Broadway Maint., supra, 90 N.J. at 259. "The contractual intent to recognize a right to performance in the third person is the key. If that intent does not exist, then the third person is only an incidental beneficiary, having no contractual standing." Ibid.

In Broadway Maintenance, which involved a multi-prime contract with a general contractor, the owner allocated all coordination duties to the general contractor in order to insulate

A-0778-14T4

itself from liability for damages to any contractor arising from lack of coordination. Id. at 256-58. The Court upheld that arrangement and ruled that the prime contractors could assert such claims only against the general contractor. Id. at 266-68.

The Court explained how the provisions of the various contracts "expressly" created mutual expectations that "failure to comply could cause damages to other prime contractors," damages would "be paid by other prime contractors whose improper performance caused delay," and "[i]f a contractor were the wrongdoer, [it would] pay those damages" itself. Id. at 261-62. Such a "promise to pay the damages of a fellow prime contractor" was "strong evidence that the injured prime contractor is an intended beneficiary who may enforce that promise." Id. at 262.

Imperial's contract in this case was devoid of similar obligations to other contractors. By the terms of its contract, Imperial was required to cooperate only with the City and Zemsky, it provided express indemnification only to them and the contract disclaimed liability for the harm that any contractor might sustain from another contractor's failure to coordinate. In short, regardless of the extent of Imperial's responsibility to coordinate, it plainly was not an enforceable duty running to the contractors. The judge properly granted Imperial summary judgment.

IV.

Citing <u>Broadway Maintenance</u>, the judge concluded the exculpatory clauses in Safeco's and Interstate's contracts were enforceable unless they violated public policy. He construed the contracts in this case to "extend the protections sought for the benefit of the City to the negligence of its retained professionals." The judge concluded Zemsky was negligent and the City "persisted in its belief . . . [Zemsky] was properly handling the issues . . . ." Although in "hindsight" the City was wrong, its error was not based upon bad faith or unfair dealing. He rejected any argument that Zemsky's negligence was unforeseen by the contractors. The judge concluded the exculpatory clauses were enforceable and barred any claim for delay damages.

Both Safeco and Interstate argue it was error to enforce the exculpatory clauses. Safeco contends it was entitled to recover the fees it paid to FAA, a construction manager it hired to complete TAK's work, because Zemsky's negligence was imputed to the City and precludes enforcement of the exculpatory clause. It also argues the City acted in bad faith and the delays were unanticipated when TAK entered into the contract.

Interstate contends its contract was ambiguous and the exculpatory clause should not be enforced because of the City's bad faith in endeavoring to avoid the consequences of Zemsky's

30

negligence. It also argues the City's decision to award contracts without complete plans was an independent source of negligence.

When the Local Public Contracts Act, N.J.S.A. 40A:11-1 to -39, was enacted in 1971, L. 1971, c. 198, §§ 1-39, the Legislature allowed publicly bid, local government contracts to include exculpatory clauses denying delay damages and limiting contractors' remedies to extensions of time. N.J.S.A. 40A:11-19 (2000). However, in 2001, the Legislature declared it was "void, unenforceable and against public policy . . . to limit a contractor's remedy for the contracting unit's negligence, bad faith, active interference, tortious conduct, or other reasons uncontemplated by the parties that delay the contractor's performance, to giving the contractor an extension of time." Ibid.; L. 2001, c. 206, § 1. No reported cases have construed the amended provision. Cf. Broadway Maintenance, supra, 90 N.J. at 269-70 (addressing only non-local government agencies or claims that predated the amendment).

"The fundamental objective of statutory interpretation is to identify and promote the Legislature's intent." Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ., 226 N.J. 297, 307 (2016) (citing State v. Gelman, 195 N.J. 475, 482 (2008) (citing DiProspero v. Penn, 183 N.J. 477, 492 (2005))). "In construing any statute, we must give words 'their ordinary meaning and

significance,' recognizing that generally the statutory language is 'the best indicator of [the Legislature's] intent.'" Tumpson v. Farina, 218 N.J. 450, 467 (2014) (alteration in original) (quoting DiProspero, supra, 183 N.J. at 492). "However, not every statute is a model of clarity. When the statutory language is sufficiently ambiguous that it may be susceptible to more than one plausible interpretation, we may turn to such extrinsic guides as legislative history, including sponsor statements and committee reports." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012) (citing Burns v. Belafsky, 166 N.J. 466, 473 (2001)).

We conclude the Legislature did not intend to broaden a public entity's liability by permitting the negligence of its agents or independent contractors to be imputed to the public entity. We reach this conclusion for a number of reasons.

Initially, the plain language of the statute provides the contractor's remedy cannot be limited to an extension to complete the work because of the "contracting unit's negligence, bad faith, active interference, tortious conduct, or other reasons uncontemplated by the parties." N.J.S.A. 40A:11-19. N.J.S.A. 40A:11-2(1) defines a "contracting unit" as a county, municipality, and certain local governmental boards, commissions, authorities, and agencies. The definition does not include the

agents or independent contractors of the "contracting unit." Ibid. In other words, the exculpatory clauses in these contracts did not violate public policy, except to the extent they exculpated the City's own conduct. There is nothing to suggest that the Legislature intended the negligent conduct of Zemsky or Imperial could be imputed to the City so as to transform a contract that did not violate public policy as to the City's agents into one that violated public policy as to the City, thereby making cognizable a damage claim against the City that otherwise did not exist.

Additionally, the history accompanying the 2001 amendment makes clear the Legislature never intended that contractors' remedies could be broadened by imputing the negligence of others to the contracting unit. The Assembly sponsor's statement described the amendment as "allow[ing] contractors to submit claims of delay caused by the contracting unit to the contracting unit for consideration." Sponsor's Statement to A. 2913 (Nov. 9, 2000) (emphasis added). The purpose of the amendment was "to create an incentive for the contracting unit to work cooperatively with the contractor to resolve project issues in a timely manner." Ibid.

The amendment was "modeled" after identical language in L. 1994, c. 80, § 1, which amended N.J.S.A. 2A:58B-3. Assembly

Local Gov't Comm., Statement to A. 2913 (Jan. 18, 2001). That 1994 enactment similarly prohibited contracts with state agencies from having exculpatory clauses that barred delay damage claims arising from a state agency's "negligence, bad faith, active interference, or other tortious conduct." N.J.S.A. 2A:58B-3(b). However, that amendment also expressly restricted delay damage claims against a state agency based on the imputed negligence of an agent: "Nothing in this section shall be deemed to void any provisions in a contract, agreement or purchase order which limits a contractor's remedy for delayed performance caused by reasons contemplated by the parties nor shall the negligence of others be imputed to the State." N.J.S.A. 2A:58B-3(c) (emphasis added); L. 1994, c. 80, § 1(c). The Senate sponsor's statement confirmed that the prohibition barring delay damage claims "applies solely to the public entity's use of these clauses to exculpate its own negligence or intentional tort[i]ous acts but does not allow a contractor to impute the sole negligence of third parties to the public entity." Sponsor's Statement to S. 977 (May 5, 1994).

In short, although we disagree with the judge's reasoning, we agree the exculpatory clauses in this case barred any claims by Safeco or Interstate against the City for delay damages occasioned by the negligence of Zemsky or other contractors. For the reasons that follow, we also reject any claim that Safeco or

Interstate may recover delay damages from the City based on the City's independent "negligence, bad faith, active interference, tortious conduct, or other reasons uncontemplated by the parties." N.J.S.A. 40A:11-19.

In its brief, Interstate argues the City acted in bad faith, a claim the judge rejected and we affirm, and Zemsky's negligence should be imputed to the City, which we reject for the reasons already stated. It also argues all delays were "uncontemplated" and therefore not subject to the exculpation clause pursuant to N.J.S.A. 40A:11-19. The judge, however, concluded the parties could anticipate an architect's negligence. For the reasons that follow, we need not address that specific conclusion by the judge.

Interstate's contract limited damages upon termination for convenience to "all reasonable shutdown costs as agreed to by both parties." Interstate fails to explain how, having been properly terminated for convenience, it can nonetheless recover any kind of damages beyond those permitted by the contract. Nor does Interstate explain how it is entitled to delay damages, given the court's final judgment against the company for $221,074.41 in favor of the City, which Interstate has not challenged on appeal. Interstate also fails to explain what consequence the settlement reached by its surety, XL, which has not participated in these appeals, has upon this argument.

Safeco contends it was entitled to delay damages both before and after Safeco took over TAK's work because of Zemsky's negligence, because of the City's lack of good faith and fair dealing and because the delay was uncontemplated. As noted, we reject the first argument and, in his findings and conclusions, the judge rejected the second, which we affirm.

Safeco arguably asserted a claim that the City's own negligence was responsible for uncontemplated delays, and the judge found a project that was supposed to be completed in one year was not completed for nearly four years. In its post-trial/pre-judgment submission, citing certain treatises and cases from other jurisdictions, Safeco contended it was entitled to "recover its costs to complete and related damages if it can prove a wrongful termination." In other words, Safeco premised its delay damage claim on the assertion that the City had not properly terminated TAK.

Safeco fails to supply us with any authority that supports the position that a surety, whose insured has been properly terminated, may assert a claim for delay damages occasioned, at least in part, by the insured's failure to perform the contract. Safeco also fails to explain how such a damage claim, even if cognizable, should be apportioned to reflect the concurrent causes

36

for the delay the judge found in this case.  We therefore reject

Safeco's claim for delay damages.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION