892 A.2d 711 (2006)
383 N.J. Super. 470
30 RIVER COURT EAST URBAN RENEWAL COMPANY and Lefrak Organization, Inc., Plaintiffs-Respondents,
v.
Eleanor CAPOGRASSO, Defendant-Appellant.
Eleanor CAPOGRASSO, Plaintiff-Appellant,
v.
30 River Court East Urban Renewal Company, Lefrak Organization, Inc., City of Jersey City, Jersey Department of Community Affairs, Michael Reegan, Walter Kreher and William Connolly, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued Telephonically February 3, 2006.
Decided March 3, 2006.
*712 Eleanor Capograsso, appellant, argued the cause pro se.
Marianne C. Tolomeo, Newark, argued the cause for respondents 30 River Court East Urban Renewal Company and Lefrak Organization, Inc. (Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman, attorneys; Sheldon M. Finkelstein, on the brief).
Karen L. Jordan, Deputy Attorney General, argued the cause for respondents New Jersey Department of Community Affairs, William M. Connolly, (Zulima V. Farber, Attorney General, attorney; Patrick DeAlmeida, Assistant Attorney General, of counsel; Ms. Jordan, on the brief).
Carmine J. Scarpa, Assistant Corporation Counsel, attorney for respondents City of Jersey City and Michael Reegan, joins in the brief of respondents 30 River Court East Urban Renewal Company and Lefrak Organization, Inc.
Before Judges COBURN, COLLESTER and S.L. REISNER.
*713 The opinion of the court was delivered by
S.L. REISNER, J.A.D.
In this case, we are called upon to decided whether a tenant's complaints about her landlord, when made to the concierge of her apartment building, can form the basis for a defamation claim by the landlord. We hold that they cannot.
The more precise questions posed are (a) whether making the statements to the landlord's employee constituted publication to a third party for purposes of a defamation claim, (b) whether this State's public policy to protect residential tenants precludes a landlord from suing a tenant in defamation for complaints made to the landlord's agent about the landlord, and (c) whether the tenant's statements are actionable if the landlord's agent does not believe them.

I
This case arises from a series of bitter disputes between a tenant, Eleanor Capograsso, and Lefrak Organization, Inc., which was responsible for constructing the apartment complex in which she lived and which was the parent of the corporation that operated the building. We briefly review the procedural history.
Plaintiffs, 30 River Court East Urban Renewal Company and its corporate parent, Lefrak Organization, Inc., sued defendant, Eleanor Capograsso, for defamation; she counterclaimed, asserting that the lawsuit was filed in retaliation for her activities with a tenant organization. She also filed a separate complaint against Lefrak, 30 River Court East, and several municipal, State and Federal entities. The gist of her complaint was that Lefrak had permitted her and other tenants to move into an apartment building before construction was finished, thus subjecting them to safety hazards and severe inconvenience. The two cases were consolidated. After defendant violated discovery orders, her answer was suppressed and her complaint and counterclaims were dismissed. The trial court held a proof hearing limited to plaintiffs' defamation claim.
Defendant's notice of appeal indicated that she was appealing from two April 30, 2004 trial court orders which addressed only the trial court's decision in favor of plaintiffs on their defamation claim. Defendant's affirmative claims against the plaintiffs and against State and municipal defendants were dismissed by the terms of earlier orders that were not included in her notice of appeal. Therefore those orders are not within the scope of her appeal, and we will not address them. See R. 2:5-1(f)(3)(i); Fusco v. Bd. of Educ. of Newark, 349 N.J.Super. 455, 460-62, 793 A.2d 856 (App.Div.), certif. denied, 174 N.J. 544, 810 A.2d 64 (2002).

II
These are the pertinent facts. Defendant, Eleanor Capograsso, was a tenant in the Presidential Plaza Towers complex, which is owned by a subsidiary of the Lefrak Organization. She lived in the 30 River Court East Tower building. According to Angel Class, the concierge at 30 River Court East Tower, on March 11, 2001, defendant called the front desk numerous times with assorted complaints. Her first complaint, at 8:15 a.m., concerned an allegation that the snow had not been properly removed from "the ring road and the sidewalks [around the complex]." Class testified that defendant
made approximately 20 phone calls to the front desk within a matter of an hour . . . In those conversations she was just ranting. Then she went on to say that . . . she knew that Lefrak had hired *714 some goons to drive her off the West Side Highway . . . Then she went on to say, I'm aware that the Lefrak Organization has been going through my mail. I'd try to explain to her that no one has access to the mail room but the Postal Service. And she went on . . . a [tirade] stating that she knew that the Lefraks had access to that room.
Class testified that defendant also told him he was unfit to have his job, and that the apartment staff were "a bunch of low lives [sic]" who did not know what they were doing. After trying to respond to her concerns, Class finally hung up on her. He then reported his conversations with defendant to his supervisor and made an entry in the log book. He testified that
[a]nything and everything is logged in that book, whether it's a food delivery, a car service picking up a tenant, a conversation with a tenant that we deem or the concierge deems necessary to log in there.
Class testified that he was employed by 30 East Hampton Renewal Corporation. When asked if he considered the Lefrak Organization to be his employer, Class responded that Lefrak was "part of the corporation that owns the building."
Fermin Garcia, who was the general manager of the apartment complex and Class' supervisor, testified that he worked for the real estate management company that managed the building on behalf of the Lefrak Organization. He confirmed that the real estate management company was "a Lefrak company."
Garcia testified that defendant was a "[u]niquely difficult" tenant who made frequent complaints and spoke to the staff in abusive terms. He described her multiple complaints about construction and noise in the building as "babbling." Significantly, he also testified that the apartment's management invited and encouraged tenants to communicate their concerns about any tenancy issue to the doorman or concierge by calling the front desk:
[I]n our buildings everyone . . . the superintendent, the concierge desk, our Management Office and porters throughout the building have walkie talkies . . . So, the point that I'm making there simply is that if with such means of communication, if Ms. Capograsso or any other tenant . . . has a request for a clogged toilet, tub or what have you, they call the desk. She would call the desk. The door . . . person, doorman in this particular case, would say, you know, Apartment 301 has a clogged toilet, tub, what have you. And within the hour . . . this work would be performed.
Garcia also testified that after defendant made numerous complaints directly to him, he asked her to stop calling his pager and instead to "make an appointment" if she wanted to talk to him.
Garcia testified that when Class reported to him that defendant had called the front desk multiple times on March 11, 2001, and that she had made the statement concerning Lefrak hiring "goons to drive her off the West Side Highway," Garcia sent her a letter:
essentially a cease and desist letter, advising her, you know, buzz off, if you don't have a life . . . find a life, go to the museum. It was . . . that oppressive for the staff . . . so I sent her a letter telling her [to] leave my staff alone.
Neither Garcia nor Class testified that they believed defendant's statements about the "goons" or about Lefrak's access to her mail. Their testimony indicated that they regarded these statements as the "ranting" or exaggerated complaints of a particularly excitable and difficult tenant.
There is no dispute that Capograsso had had a long-running series of disputes with *715 the landlord concerning conditions in the apartment building, stemming in large part from the fact that the building was still under construction although tenants were living on the lower floors. She had also participated in creating a tenants' organization.
In an oral opinion issued on March 4, 2004, the trial judge concluded that Lefrak and the management company had "a parent subsidiary relationship" and were "one entity" for purposes of the litigation. He concluded that defendant's statements to Class concerning Lefrak hiring "goons to run her off the West Side Highway" and "[g]oing through her mail," were defamatory per se, because they accused Lefrak of committing crimes. He reasoned that defendant "accused Lefrak of a specific illegal act that reflects negatively on and could adversely affect the company's reputation." And "[r]egardless of the obvious illegality, no tenant would want a landlord to read their mail." He also concluded that these statements were false, based on the testimony of Class. Finally, he concluded that the statements were "published" because they were spoken "to Mr. Class, a person other than the plaintiff."

III
While we will defer to the trial court's factual findings so long as they are supported by sufficient, credible evidence in the record, our review of the trial court's legal conclusions is de novo. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974); Manalapan Realty v. Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995). Employing that standard, we find no error in the trial court's conclusion that Lefrak and its subsidiary should be treated as one entity for purposes of the litigation. Therefore, we refer to Lefrak as the landlord. We part company with the trial court on the issue of whether Capograsso's statements about Lefrak, made to the concierge of her building, constituted defamation.

A. Publication to a Third Party
The tort of defamation requires that plaintiff prove "publication" of a slanderous statement. "Since the law of defamation seeks to secure reputation, there must be a communication to a third person." Gnapinsky v. Goldyn, 23 N.J. 243, 252, 128 A.2d 697 (1957). The first issue is whether Capograsso's statements to Class amounted to "publication."
Since there is no New Jersey case law directly on point, we first consider the development of the law as reflected in other sources, beginning with the Restatement. According to the Restatement,
the communication to a servant or agent of the person defamed is a publication although if the communication is in answer to a letter or a request from the other or his agent, the publication may not be actionable in defamation.
[Restatement (Second) of Torts § 577, comment e (1977).]
In some jurisdictions, the requirement that the communication come in response to a "request" has been construed as extending to an agent whose official responsibilities include receiving such communications. Thus, in McDaniel v. Crescent Motors, Inc., 249 Ala. 330, 31 So.2d 343 (1947), the Supreme Court of Alabama held that critical statements, which a supervisor made about a bus driver in a conversation with the driver's union representative, were not actionable:
Publication is essential to slander, and it must be in the presence of one or more other parties. So that if the words were spoken only to the complaining party or to his agent, representing him in the *716 matter discussed and invited by him, it is not such a publication as will support an action for slander. This includes one who is interceding for the employee as his authorized agent and representative.
[Id. at 344; citations omitted.]
See also Mims v. Metro. Life Ins. Co., 200 F.2d 800, 802 (5th Cir.1952), cert. denied, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1366 (1953) ("[I]f the language complained of was uttered only to the complaining party or to his agent representing him in the matter discussed in the communication, it is not such a publication as will support an action for slander. Particularly is this true where the communication was solicited by the plaintiff or his agent.").
Following McDaniel, the Indiana Court of Appeals held, in a case with similar facts, that "publication to an agent of plaintiff who is acting at plaintiff's behest and on his behalf is tantamount to a publication to plaintiff himself, and as such does not fulfill the publication requirement." Brockman v. Detroit Diesel Allison Div. of Gen. Motors Corp., 174 Ind.App. 240, 366 N.E.2d 1201, 1203 (1977).
The courts of New Jersey have not addressed the specific issue presented here. In Mick v. American Dental Association, 49 N.J.Super. 262, 139 A.2d 570 (App.Div.), certif. denied, 27 N.J. 74, 141 A.2d 318 (1958), the plaintiff, a dentist, asked a fellow practitioner to write a letter to the American Dental Association inquiring about plaintiff's reputation. When the Association wrote back with an unflattering assessment, plaintiff sued for defamation. We cited McDaniel, supra, in concluding that "[w]hen the publication of defamatory matter has been invited, instigated or procured by the one defamed, or by someone acting on his behalf, he generally cannot be heard to complain of the resulting injury." Id. at 275, 139 A.2d 570.
We reached a similar conclusion in Beck v. Tribert, 312 N.J.Super. 335, 711 A.2d 951 (App.Div.), certif. denied, 156 N.J. 424, 719 A.2d 1022 (1998). There an employee asked several of his friends to pose as prospective employers and contact his former employer for references about him. Relying on the Restatement, § 577, comment e, and on Mick, we concluded that the former employer's negative statements to plaintiff's friends were not "published" to a third party:
Tribert also made defamatory statements to plaintiff's friends, Halley and Donnell, who posed as prospective employers. These statements also do not form the basis for a slander claim because they were not published. The Restatement (Second) of Torts § 577 cmt. e, at 203 (1977), provides that "the communication to a servant or agent of the person defamed is a publication although if the communication is in answer to a letter or a request from the other or his agent, the publication may not be actionable in defamation."
[Id. at 350, 711 A.2d 951; emphasis added.]
In Murphy v. Johns-Manville Products Corporation, 45 N.J.Super. 478, 490, 133 A.2d 34 (App.Div.), certif. denied, 25 N.J. 55, 134 A.2d 833 (1957), we analyzed the issue of intra-company distribution of employee information in terms of qualified privilege rather than publication. There, an employee, who had been fired for stealing company supplies, claimed that he was defamed when the employer sent copies of the minutes of his union grievance hearing to several company managers and sent a letter summarizing the company's decision to his union president. While noting that we would follow § 577 comment e of the Restatement if we were to reach the issue of publication, we decided the case on the issue of qualified privilege instead; we *717 held that the employer could claim a qualified privilege, because it acted pursuant to a duty to distribute the minutes to persons within the company who had an interest in seeing them, and pursuant to a duty to notify the union president of management's decision on the grievance. Id. at 489-92, 133 A.2d 34.
We conclude that the Restatement § 577 comment e, and the cases that follow the Restatement, are the most appropriate precedent here. We also agree with Beck, supra, that invited communications to an agent are not "published" for defamation purposes. Accordingly we apply that analysis to the facts of this case.
Based on the undisputed record, we have no hesitation in concluding that Lefrak was the landlord, and that Class was the landlord's agent. The record supports the trial court's conclusion that 30 River Court East Urban Renewal Company was a wholly owned subsidiary of Lefrak Organization, Inc., and that plaintiff's should be treated as one entity for purposes of the lawsuit. Further, the undisputed record reveals that Class, as the concierge, was authorized to accept complaints from tenants. And the building superintendent, Garcia, testified that he encouraged tenants, including plaintiff specifically, to voice complaints by calling the concierge at the front desk rather than by calling Garcia directly. Hence, we conclude that the landlord, through its superintendent, invited and directed plaintiff to make any complaints concerning the tenancy to Class.
We also conclude that plaintiff's statements related directly to her tenancy, insofar as they expressed her views, rational or not, that the landlord was out to get her by hiring "goons" to persecute her and by opening her mail. Coming as they did, in the midst of a general tirade about her tenancy problems, her statements about the landlord can be construed no other way.
We conclude that a landlord, having designated an agent to accept tenant complaints, cannot sue a tenant in defamation for complaining to the agent. Tenant complaints to a landlord's designated agent, such as a concierge or superintendent, are implicitly if not explicitly invited. Even if they are complaints about the landlord and not specifically about the building itself, so long as they are made to the landlord's agent, they are within the scope of the invitation. And because the agent is merely a stand-in or conduit for the landlord, the agent is not a "third party" for defamation purposes. Communications to the agent are in effect communications to the landlord and are not "published" to a third party.
This construction of comment e to § 577 of the Restatement is consistent with common sense and with the purpose of the law of defamation to protect reputation. Where an agent's duty includes taking customer complaints on behalf of the agent's principal, there is little likelihood that any complaints the customer makes about the principal will affect the principal's reputation. This is because the agent's duty of loyalty to the principal makes it most likely that the agent will communicate the complaints to the principal and will not publish them to third parties outside the agent-principal relationship. Further, as in this case, one whose duty is to take customer complaints is highly likely to regard outrageous customer statements with skepticism, again diminishing the likelihood that the principal's reputation will be affected.
We recognize that customer service communications could also be analyzed using the "qualified privilege" doctrine discussed in Murphy, supra, and in § 593 of the Restatement. See Restatement (Second) *718 of Torts § 593. But we choose the "invited communication" approach of § 577 comment e, as we have construed it, because it achieves the correct result with a less complex analysis and will therefore be easier to apply. See Restatement (Second) of Torts § 577 comment e.

B. State legislation
Our conclusion, that tenant complaints are not actionable in defamation, is consistent with State law. The Legislature has expressed in no uncertain terms the policy of this State to protect tenants against substandard housing conditions. See N.J.S.A. 55:13A-1 to -28; N.J.S.A. 55:13A-2 (declaring the purpose of the Hotel and Multiple Dwelling Law "to assure the provision . . . of decent, standard and safe units of dwelling space.") To that end, the owner of a multiple dwelling is legally required to make an agent available to take tenant complaints concerning emergencies and necessary repairs. See N.J.S.A. 55:13A-12 (requiring multiple dwelling owners to file a certificate of registration with Commissioner of Community Affairs and to post a copy in the lobby of the premises); N.J.S.A. 46:8-29 (landlord must give copy of registration statement to each tenant); N.J.A.C. 5:10-1.11(18) and (19) (registration statement must include "[t]he name and address, including the dwelling unit, apartment or room number, of any person employed by the owner or managing agent to provide regular maintenance service" and "[t]he name, address and telephone number of an individual representative of the owner or managing agent who may be contacted at any time and who has authority to make emergency decisions concerning the building and any repair thereto or expenditure in connection therewith"); N.J.A.C. 5:10-11.1 to -11.3 (maintenance and janitorial services required, duties and responsibilities of manager).
Further, consistent with the Anti-Eviction Act, N.J.S.A. 2A:18-61.1, a residential tenant may withhold rent from a landlord where, after receiving notice from the tenant, the landlord fails to repair significant defects in the rented premises. See Marini v. Ireland, 56 N.J. 130, 146-47, 265 A.2d 526 (1970); Berzito v. Gambino, 63 N.J. 460, 469-70, 308 A.2d 17 (1973).
Based on the foregoing, we conclude that landlords are required by law to invite communications from their tenants, either directly or through a superintendent or concierge. And tenants must be able to bring problems to a landlord's attention without having to worry that if they complain too stridently the landlord will sue them for defamation.

C. The listener's belief
Finally, we address defendant's alternate contention concerning the agent's belief or disbelief of her statements. Relying on Ricciardi v. Weber, 350 N.J.Super. 453, 478, 795 A.2d 914 (App.Div.2002), certif. denied, 175 N.J. 433, 815 A.2d 479 (2003), defendant contends that her statements were not actionable because Class did not believe them. In Ricciardi, a case involving statements that were not per se defamatory, we stated that "[t]here . . . can be no defamation if the recipients of the alleged defamation did not believe the statements." Ibid. We cited Nanavati v. Burdette Tomlin Memorial Hospital, 857 F.2d 96, 109 (3d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989), in support of our conclusion.
We find Nanavati instructive. Nanavati involved a bitter feud between two doctors at a local hospital. In one of the alleged defamatory incidents, Dr. Nanavati made a statement about his nemesis, Dr. Sorenson, that would have constituted slander per se, because it cast aspersion on *719 Dr. Sorenson in "his business, trade, profession or office." Gnapinsky v. Goldyn, 23 N.J. 243, 250, 128 A.2d 697 (1957). Nonetheless, the court cogently analyzed the matter as follows:
While testifying at trial, an EKG technician, Ann O'Neil, provided surprise testimony that Nanavati called Sorensen a "senile old doctor that had been there [the Hospital] for 20 years killing patients.". . . The statement was uttered in the course of a November 1985 conversation in which Nanavati complained to O'Neil that Sorensen had a locked drawer in which to keep his prescription pads but that he, Nanavati, did not. O'Neil testified that she was the only one to hear the comment alleging Sorensen's incompetence and senility and did not believe it. Additionally, she testified that when she challenged Nanavati, he asserted: "That's not opinion, that's facts." Finally, O'Neil testified that she wrote the statement down and two days later gave it to her superior at the Hospital.
Upon hearing O'Neil's testimony, Sorensen successfully moved for leave to amend, over objection, to add this statement as a ground for his defamation claim. Nanavati claims that the mid-trial amendment was an abuse of discretion. He also submits that the statement to O'Neil caused no injury. In our view, the injury alleged here borders on the metaphysical. The facts indicate that no one who heard the slander believed it, and those who repeated the slander did so only to express outrage at the speaker. The entire situation seems more like a fiendish law school hypothetical gone amok than a compensable claim for slander. We believe that New Jersey would not compensate for slander under these facts.
[Nanavati, supra, 857 F.2d at 109; emphasis added; citation omitted.]
We agree with this analysis and find it applicable here. Neither Class nor his supervisor Garcia testified that they believed Capograsso's statements about the landlord hiring "goons" and going through her mail. From their testimony, we conclude that no reasonable trier of fact could conclude otherwise than that they both dismissed her statements as the "ranting" of an irritable, irrational and "uniquely difficult" tenant. See Ward v. Zelikovsky, 136 N.J. 516, 532-33, 643 A.2d 972 (1994) (insults are less likely to be perceived as true statements when made in the midst of an angry outburst). In context, neither statement had even a remote possibility of causing harm to the landlord's reputation, and for that reason they cannot support a claim for defamation.[1]

IV
We do not condone Capograsso's abusive conduct toward the staff of her apartment complex. Indeed we echo the comments of the Supreme Court in Ward, supra:
There is a regrettable rudeness in our society today. Social and public discourse is marked by uncivility and boorishness.
[136 N.J. at 542, 643 A.2d 972.]
But legal precedent and common sense lead us to conclude that the statements she made to her landlord's agent, complaining about the landlord's alleged wrongful conduct *720 toward her as a tenant, are not actionable as defamation.
Reversed.
NOTES
[1] The Supreme Court has acknowledged criticism of the doctrine of slander per se and has cautioned "against further expansion of the highly-criticized per se categories," Ward, supra, 136 N.J. at 540, 643 A.2d 972, noting "[w]e leave for another time whether we should eliminate slander per se." Id. at 541, 643 A.2d 972. See also Biondi v. Nassimos, 300 N.J.Super. 148, 154-56, 692 A.2d 103 (App.Div. 1997).