**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3803-17T1

ETHAN SHAPIRO,

    Plaintiff-Respondent,

v.

TRIMARAN CAPITAL
PARTNERS and DEAN
KEHLER,

    Defendants-Appellants,

and

MICHAEL ABATE and RONALD
W. GASWIRTH,

    Defendants.

_____

Submitted March 26, 2019 – Decided May 31, 2019

Before Judges Fisher, Hoffman and Suter.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3889-15.

Paduano & Weintraub, LLP, and Leonard Weintraub and Kristen Madison (Paduano & Weintraub, LLP) of

the New York bar, admitted pro hac vice, attorneys for appellants (Leonard Weintraub, Anthony J. Paduano and Kristen Madison, on the briefs).

Stone & Magnanini, LLP, and Douglas A. Daniels and Sabrina R. Tour (Daniels & Tredennick, LLP) of the Texas bar, admitted pro hac vice, attorneys for respondent (Robert A. Magnanini, Alex Barnett-Howell, Douglas A. Daniels and Sabrina R. Tour, on the brief).

PER CURIAM

Following a bench trial, defendant Trimaran Capital Partners (Trimaran) appeals from a Law Division order entering judgment in the amount of $569,965 in favor of plaintiff Ethan Shapiro. For the reasons that follow, we reverse.

Trimaran serves as a marketing company for Trimaran Fund Management, LLC and its affiliates, which manage funds of approximately $2.25 billion in assets, with investments in hundreds of diverse companies. In 2004, Trimaran became the majority shareholder of Urban Brands, Inc. (UBI), a clothing business, after it invested $13 million into UBI, on top of a $5 million investment made approximately ten years earlier. Plaintiff was promoted from UBI's interim chief executive officer (CEO) to UBI's permanent CEO after Trimaran became the majority shareholder in 2004; he was terminated in 2008.

When plaintiff became CEO, he invested in UBI in order to have "skin in the game," purchasing senior UBI notes. Between April 2004 and February

2008, plaintiff (and other members of UBI's senior management) purchased senior UBI notes bearing a 10.38% interest rate. Plaintiff paid a total of $425,000 for the notes; by April 15, 2010, plaintiff's notes were valued at $631,395. Between 2006 and 2009, Trimaran purchased notes totaling approximately $56 million.

UBI maintained a revolving credit facility with Bank of America and its predecessor, LaSalle Retail Finance. Beginning in 2004, the holders of the senior UBI notes, including plaintiff and Trimaran, entered into intercreditor agreements with UBI and Bank of America. The agreements provided that UBI could not repay the principal on its notes without written approval of Bank of America.

During plaintiff's first two years as CEO, UBI performed well, but by 2007, financial difficulties ensued. UBI's respective losses for 2007 and 2008 were $38 and $44 million.[1] UBI's board of directors fired plaintiff in September 2008. At that point, plaintiff requested payment of his senior notes, which UBI denied.

---

[1] Notwithstanding the large loss in 2007, in December 2007, UBI gave plaintiff a new employment contract, which included a severance benefit of three year's salary; his annual salary of $650,000 did not change.

A-3803-17T1

UBI continued to struggle financially after plaintiff's termination, and the credit facility with Bank of America was set to end in February 2010. At that time, UBI had no cash in its accounts and began to withhold payments owed to creditors. UBI had the maturity date of its loan agreement with Bank of America extended from February 3, 2010 to April 15, 2010, the maturity date of the senior UBI notes.

Senior noteholders, including plaintiff, received letters from UBI in early February 2010, requesting them to extend the maturity date of their notes by four years, from April 15, 2010 to April 15, 2014. A cover letter enclosing the letter and financial information stated: "If you have any questions . . . please contact the [c]ompany's counsel, Randall Ray of Gardere Wynne Sewell LLP."

Plaintiff testified that after reading the letter, he understood that UBI was having financial difficulties, and believed that UBI was working to obtain a new credit facility and needed additional time to secure new financing. However, he believed that UBI's financial situation would improve and that its long-term prospects were strong. He also understood that Bank of America required all noteholders to agree to the extension in order for it to extend its loan to UBI. Plaintiff hired attorney Lawrence Langerman to negotiate the potential extension of his notes.

A-3803-17T1

UBI sent a follow-up letter dated February 12, 2010, again requesting the noteholders to extend the majority date of the senior UBI notes, and providing answers to "frequently asked questions" from senior noteholders following the first letter. This letter explained that UBI needed "to refinance its existing [c]redit [f]acility, and it need[ed] additional time to work with new lenders on a new credit facility." The letter noted that Trimaran had "already agreed to the four-year extension of its [n]otes."

The letter further indicated that Bank of America had "informed [UBI] that it will not agree to any payment on the [n]otes – principal or interest – in connection with the [n]ote extensions." One "frequently asked question" read, "If a . . . [n]oteholder does not agree to extend the maturity date of its [n]otes (either outright or because of demands for different treatment that [UBI] cannot agree to) will the [n]otes that are not extended be paid at the original maturity date of April 15, 2010?" The letter provided:

> No. . . . [UBI] cannot pay the [n]otes without the consent of [Bank of America] under the existing [c]redit [f]acility.
>
> The [bank] is protected by Bank Intercreditor Agreements that each of you signed when you purchased your [n]otes. [UBI] cannot, without written consent from the [bank] or until the termination of the Bank Intercreditor Agreements, generally make any payments on the [n]otes. . . . The [bank] has informed

5

A-3803-17T1

[UBI] that it will not agree to any payment on the [n]otes.

Bank of America again agreed to extend the maturity date of its loan with UBI, this time to August 15, 2010, if each of the noteholders agreed to extend the maturity date for their notes. UBI intended to use this extension to secure an alternate funding source.

Plaintiff received another letter from UBI, dated February 17, 2010, requesting a limited extension of the maturity date from April 15, 2010, to February 15, 2011. As a condition of agreeing to the extension, plaintiff wanted assurance that if any of the other senior noteholders were paid on their UBI notes as a result of refusing to extend, he would also be paid on that same basis. On February 18, 2010, plaintiff's attorney emailed Ronald W. Gaswirth, an attorney at the Gardere firm, stating in pertinent part, "We would like something in writing that states if you pay any other of the [n]otes, we will also be paid." Gaswirth responded, "As you know the [c]ompany cannot repurchase any of the notes under the terms of the loan documents previously furnished to you. If the [c]ompany does somehow repurchase any of the [n]otes, [plaintiff]'s notes will also be repurchased on the same basis." On February 25, 2010, plaintiff signed the signature section of the February 17, 2010 letter, agreeing to extend the maturity date of his notes to February 25, 2011; however, the letter did not

6

contain language stipulating that plaintiff would receive payment on the notes in the event other noteholders received payment for their notes after refusing to extend their maturity dates.

On April 15, 2010, Bank of America agreed to allow UBI to repurchase the notes from noteholders who had refused to extend the maturity date on their notes. In late June 2010, UBI repurchased those notes for $613,000, including interest owed, using funds borrowed from Bank of America. Afterward, UBI had approximately $500,000 left on its revolving line of credit with Bank of America. Plaintiff, who was owed $631,000, was not notified by UBI or Trimaran of these facts.

UBI did not repurchase the notes of plaintiff, defendant, or seven other current or former UBI senior management members who had all agreed to extend the maturity date of their notes. Bank of America never consented to their repurchase.

Throughout the spring and summer of 2010, UBI continued to search for a commercial lender to replace Bank of America, since Bank of America refused to extend its credit facility past August 14, 2010. Unable to secure such financing, UBI filed for bankruptcy on September 20, 2010. Since plaintiff's notes were unsecured and subordinate to UBI's other debt, plaintiff recovered

A-3803-17T1

approximately $62,000 of the $631,000 he was owed on the notes. At the time of the bankruptcy, defendant's principal investment in UBI was approximately $56 million (approximately $73 million with interest); Trimaran did not recover any of that amount in the bankruptcy.

In September 2015, plaintiff filed a complaint asserting fraud and negligent misrepresentation in connection with the extension of the maturity dates on his notes. In his complaint, plaintiff sued Trimaran, its managing partner and UBI board member Dean Kehler, former UBI officer Michael Abate, and Gaswirth. In March 2016, plaintiff dismissed his claims against Gaswirth, and in March 2017, plaintiff settled his claims with Abate. In July 2017, the remaining defendants moved for summary judgment, which the trial court denied.

A bench trial was held before the Law Division in November and December 2017. On March 12, 2018, the trial judge, in a written opinion, ruled in favor of plaintiff, and against Trimaran, on the negligent misrepresentation claim, for $569,965 – the difference between the amount originally owed to plaintiff on the notes, and the amount he received in UBI's bankruptcy proceeding. The judge found Trimaran liable to plaintiff as a shareholder by piercing the corporate veil. The judge dismissed plaintiff's fraud claim against

Trimaran, and dismissed the entire complaint against Kehler individually. On March 26, 2018, the trial court entered an order consistent with its opinion.

In dismissing plaintiff's fraud claim, the judge found that Gaswirth correctly represented that: Bank of America had to consent to UBI's payment of the notes, as expressed in the intercreditor agreements; the bank had "consistently refused . . . the payment of any senior UBI notes"; and it "was only until April 2010[] that the [b]ank . . . consented to the payment of some of the note[]holders. This was very close to the notes' maturity dates." The judge determined the elements of fraud were not established when the contents of Gaswirth's email were proven false, because plaintiff had "not set forth any evidence that . . . defendants knew or believed that the representation was false at the time that the statement was made, or that . . . defendants intended to deceive plaintiff by making the statement." On the whole, the judge stated that no evidence was presented demonstrating that defendants acted with a "nefarious purpose," a "fraudulent intent," or "with any actual malice" toward plaintiff.

However, the judge found that the representations in Gaswirth's email to plaintiff were made negligently. The judge first found Trimaran vicariously liable for Gaswirth's actions, as Gaswirth "reported directly and exclusively to"

Wes Barton, an employee of Trimaran, "as it concerned the negotiations with plaintiff." Barton, who was never employed by UBI, interacted with plaintiff when he was UBI's CEO on behalf of Trimaran, and often reviewed UBI's financial records on behalf of Trimaran. The judge found that the statements in Gaswirth's email triggered a duty to speak truthfully, that this duty was breached when the statements were proven "incorrect and uncorrected," and that proximate cause was established when "the decision that [plaintiff] was induced to make ultimately and directly le[]d to" his losses. However, the judge noted "there might have been, but unbeknownst to . . . plaintiff, a lack of funds by which UBI was unable to pay for . . . his notes plus interest . . . ."

Finally, the judge held that "any immunity that [Trimaran] claim[ed] as a shareholder of UBI [was] dissolved and any corporate veil sought by [defendant] to shield the imposition of liability for its negligent misrepresentation to . . . [p]laintiff is pierced because of the dominance that [Trimaran] exercised over UBI's business affairs." According to the judge, "the credible direct and circumstantial [evidence] demonstrate[d] that [defendant] so dominated UBI that UBI was a mere instrumentality and conduit for [Trimaran]." "Essentially, because of the influence possessed by [Trimaran], UBI and [Trimaran] were . . . one and the same."

10

The judge listed the following factors, among others, in support of his holding that Trimaran exerted "substantial influence" over UBI: "Trimaran was the majority shareholder of UBI and had the largest concentration of allies and votes on . . . UBI's board"; Kehler had a "significant influence" on UBI's board, such that "[n]o decisions of consequence could be made without [his] approval"; UBI paid $250,000 per year to defendant as a management fee; Kehler and Bill Phoenix, a managing director of Trimaran who served on UBI's board, "had a conspicuous presence at UBI, as opposed to the other directors"; "[a]t least two of the other directors acknowledged the import and dominance of Trimaran's presence on the board"; "UBI [was] dependent on Trimaran as a source of funding"; there was evidence Trimaran "coordinated the negotiations between UBI and . . . Bank of America, and [was] integrally involved with note transactions and related negotiations"; and "Barton was 'very involved' with the business pursuits of UBI as Trimaran's representative with the company."

Our standard of review of the court's findings in this bench trial is limited. An appellate court shall "not disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice . . . ." Seidman v. Clifton Sav. Bank, S.L.A.,

11

205 N.J. 150, 169 (2011) (quoting In re Trust Created by Agreement Dated December 20, 1961, 194 N.J. 276, 284 (2008)); see also Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974); Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985) (noting that the trial court's "major role is the determination of fact").  We only review de novo the trial court's legal determinations.  30 River Court E. Urban Renewal Co. v. Capograsso, 383 N.J. Super. 470, 476 (App. Div. 2006) (citing Rova Farms, 65 N.J. at 483-84).

Defendant first argues that the trial court lacked an adequate evidentiary basis in holding it liable to plaintiff for negligent misrepresentation.  We agree.

Piercing the corporate veil is an equitable doctrine invoked to provide a remedy for an underlying wrong, where a remedy would otherwise be unenforceable because the primary defendant is a corporation without sufficient assets to pay the award.  See Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J. Super. 160, 198-99 (App. Div. 2006).  Courts developed the doctrine to prevent the corporate form from "being used to defeat the ends of justice" or as a vehicle for an illegitimate purpose.  State, Dept. of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983).

A party seeking to pierce the corporate veil bears the burden of proving that doing so is appropriate.  Richard A. Pulaski Constr. Co. v. Air Frame

12

Hangars, Inc., 195 N.J. 457, 472 (2008) (citations omitted). "[A] corporation is an entity separate from its stockholders[,]" and "[i]n the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals." Lyon v. Barrett, 89 N.J. 294, 300 (1982) (citations omitted).

To pierce the corporate veil, a plaintiff must establish two elements: 1) that a subsidiary was "a mere instrumentality of the parent corporation" and "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent," Ventron, 94 N.J. at 500-01 (citations omitted), and 2) "the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Id. at 501 (citing Mueller v. Seaboard Commercial Corp., 5 N.J. 28, 34-35 (1950)); see Verni, 387 N.J. Super. at 199-200. Here, assuming all of the trial court's factual findings as true, plaintiff establishes neither of these elements.

Regarding the first element, in determining whether a parent corporation so dominated a subsidiary that it was a conduit for the parent, the extent of control sought by courts is "not merely majority or complete stock control, but complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity . . . had at the

time no separate mind, will or existence of its own . . . ." 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41, at 156 (perm. ed., rev. vol. 2015); see also Ventron, 94 N.J. at 500-01; Mueller, 5 N.J. at 34-35. With this domination, "the corporate form is used as a shield behind which injustice is sought to be done by those who have the control" of the subsidiary. Mueller, 5 N.J. at 35 (quoting Irving Investment Corp. v. Gordon, 3 N.J. 217, 223 (1949)).

Here, there was no credible evidence that Trimaran so dominated UBI that UBI had no separate existence and was merely a conduit of Trimaran. Verni, 387 N.J. Super. at 199. Trimaran had substantial influence over UBI's Board of Directors (Board) because it was the majority shareholder. As the majority shareholder, defendant had the votes necessary to place a majority of the members on the Board; however, Trimaran only held two out of the six Board seats. The remainder of the Board was filled by three independent Board members, with no affiliation to Trimaran: Ed Finkelstein, Joi Gordon, and Darryl Thompson, as well as plaintiff when he was the CEO.

Outside of their affiliation with Trimaran, there was no evidence that Kehler or Phoenix dominated or controlled UBI's Board. At trial, plaintiff admitted his contention that Kehler dominated or controlled the UBI Board was

14

based on his subjective belief, and he could not provide a specific example of Kehler's dominance or control. Rather, he testified that Trimaran "probably" controlled the UBI Board as a result of its financial position.

Both Gordon and Thompson testified that although Trimaran was the majority shareholder, and could move the company in the directions that a majority shareholder could, Kehler and Phoenix did not override the UBI Board, and neither could recall one instance where either blocked a measure that the remainder of the Board wanted to pursue. Thus, Trimaran's influence over the Board was a result of its inherent rights as majority shareholder, not as a result of any improper or undue influence over the other Board members.

The trial court's conclusion that Kehler and Phoenix had a "conspicuous presence" at UBI was also not supported by the credible evidence. Neither Kehler nor Phoenix had an office at UBI's headquarters, oversaw or supervised any of UBI's employees, or were involved in UBI's day-to-day business. The trial testimony revealed that other than quarterly Board meetings, Kehler and Phoenix visited UBI's office in Secaucus approximately once or twice a year. Even plaintiff testified that he did not specifically remember Kehler visiting UBI's offices more frequently, and admitted that he or other UBI officers requested that Kehler attend some of those meetings.

While the trial court correctly pointed out that Trimaran was a source of funding, UBI had other sources of funding, including its credit facility with Bank of America, and its cash receivables. Although UBI was cash-poor and continuously looked to Trimaran for additional funding, defendant invested in UBI and secured promissory notes. These investments, along with the fact that UBI paid $250,000 per year to Trimaran as a management fee, demonstrate that Trimaran and UBI maintained appropriate separation as entities and avoided the commingling of funds.

It is undisputed that all the corporate formalities were followed. Trimaran and UBI had, among other things, separate offices, phones, emails, computer systems, and bank accounts. They maintained and filed separate financial statements and corporate records, had separate bylaws, held separate board meetings, and they did not share any employees. Trimaran's apparent involvement in UBI's day-to-day operations was the result of Trimaran monitoring its investment, performing due diligence to determine whether any further investment was warranted and prudent, and fulfilling its obligations under its management agreement with UBI. There is no evidence that the presence of Kehler, Phoenix, or Barton at UBI's offices, or their alleged involvement in UBI's operations, exceeded Trimaran's authority under its

16

management agreement with UBI. Plaintiff did not establish that Trimaran exerted corporate dominance over UBI. Verni, 387 N.J. Super. at 199.

As to the second element, no fraud or injustice appears in the record, nor any other fact indicating the desire to circumvent the law on the part of either company. Ventron, 94 N.J. at 500-01. Indeed, the trial court explicitly dismissed plaintiff's fraud claim in its written opinion, finding no evidence of "fraudulent intent," or "actual malice" by Trimaran toward plaintiff. Moreover, there is no evidence of injustice to warrant piercing the corporate veil given that Trimaran lost substantially more funds from UBI's bankruptcy than plaintiff, after it too agreed to extend the maturity date on its notes. Plaintiff failed to demonstrate that Trimaran abused the privilege of incorporation to perpetrate an alleged injustice.

Having found reversible error occurred in this regard, we need not address plaintiff's remaining arguments. However, we observe that plaintiff also failed to demonstrate that any alleged misrepresentation was the proximate cause of his loss. Namely, plaintiff offered no evidence that if had he had refused to extend the maturity dates of his notes in February 2010, he would have been paid on his notes along with the other noteholders that refused to extend the maturity date on their notes. UBI repurchased the notes of those shareholders

for $613,000, after Bank of America consented. Going into the repurchase, UBI had no cash and less than $1 million left in its revolving line of credit. Plaintiff was owed approximately $631,000 on his notes, thus the total payout including plaintiff would have been $1.24 million, which exceeded the credit available to UBI. Plaintiff presented no evidence that Bank of America would have increased the available credit to UBI in order to repurchase plaintiff's notes, or that Trimaran would have provided UBI with funds to do so. Rather, Kehler testified that defendant had reached its limit and did not intend to make any further investments in UBI. Thus, plaintiff did not "show that the [alleged] negligence was a 'substantial factor' contributing to the result." Broach-Butts v. Therapeutic Alts., Inc., 456 N.J. Super. 25, 40 (App. Div. 2018).

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3803-17T1