**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3399-18T1

JESSICA ARDILES and
CHRISTIAN ARDILES,

      Plaintiffs,

v.

STEVEN D'AGOSTINO,

      Defendant/Third-Party
      Plaintiff-Appellant,

v.

MELISSA CARLIN, REMAX
HOMELAND WEST, PETER
SEEMS, BRIAN SCOTT,
RE/MAX REAL ESTATE, LTD,

      Third-Party Defendants-
      Respondents,

and

FAMILY FIRST FUNDING,
JOSH BLAIR, DANA TEEPLE,
RONALD BENNARDO, ROBERT
LAMB, JESSICA DONNELLY,
SANDRA IAMMATTEO, JUDITH

AMORSKI, FIRST ATLANTIC
FEDERAL CREDIT UNION, LES
KRAMSKY, 2119 RT. 35, LLC,
GEORGE VEITENGRUBER, LISA
HAMMELL, SOUTHERN OCEAN
MEDICAL CENTER, and RMB, INC.,

       Third-Party Defendants.

_____

> Argued February 10, 2020 – Decided August 24, 2020
>
> Before Judges Fasciale and Mitterhoff.
>
> On appeal from the Superior Court of New Jersey,
> Law Division, Ocean County, Docket No. L-2130-17.
>
> Steven D'Agostino, appellant, argued the cause pro se.
>
> Andrew S. Turkish argued the cause for respondents
> Melissa Carlin and Remax Homeland West (Clausen
> Miller, PC, attorneys; Andrew S. Turkish and Marisa
> G. Michaelsen, on the brief).

PER CURIAM

In this residential real estate contract dispute, Steven D'Agostino appeals

pro se from four orders: an April 20, 2018 order dismissing his claims against

third-party defendants Brian Scott and Re/Max Real Estate, Ltd; a June 26,

2018 order granting summary judgment in favor of third-party defendant Peter

Seems; an August 9, 2018 order granting summary judgment in favor of third-

party defendants Remax Homeland West (Remax) and Melissa Carlin

(collectively, the Carlin defendants); and a September 14, 2018 order denying reconsideration of the August 9 order.

As an initial matter, D'Agostino has settled his claims with Scott, Re/Max Real Estate, Ltd, and Seems,[1] so we dismiss the appeal in part with prejudice, to the extent that D'Agostino's arguments contest the dismissal of his claims against these third-party defendants.[2] We also decline to address the September 14, 2018 order, as D'Agostino makes no argument in his appellate briefs pertaining to it, see Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived."), and D'Agostino's argument concerning third-party defendants Lisa Hammell, First Atlantic Federal Credit Union, and Judith Amorski,[3] as he did not identify the orders pertaining to this issue in his notice of appeal, see R. 2:5-1(e)(3)(i) ("In civil actions the notice of appeal . . . shall designate the judgment, decision, action or rule, or part thereof appealed from[.]"); 30 River

[1] Seems wrote to the court on September 13, 2019, stating he has settled with D'Agostino, and in his reply brief, D'Agostino acknowledges this settlement. D'Agostino, Scott, and Re/Max Real Estate, Ltd signed a stipulation of dismissal with prejudice on October 15, 2019.

[2] Specifically, we decline to consider the arguments under point heading one and under the portion of point heading two as it relates to the judge's dismissal of the claims against Seems.

[3] Specifically, we decline to address the argument under point heading three.

Court E. Urban Renewal Co. v. Capograsso, 383 N.J. Super. 470, 473-74 (App. Div. 2006) (declining to address matters the trial judge decided in orders not identified in the notice of appeal). Therefore, we consider only the merits of D'Agostino's argument that the judge erred in granting the Carlin defendants' motion for summary judgment. Having reviewed the record, we affirm the dismissal of D'Agostino's claims against the Carlin defendants.

We discern the following relevant facts from the record, viewing them in a light most favorable to D'Agostino. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). In January 2016, Jessica and Christian Ardiles were introduced to Carlin when they contacted Remax Homeland West to inquire about purchasing a home. After learning that D'Agostino's Barnegat property was listed for sale, Carlin contacted him to ask if he would be interested in selling to the Ardileses.

On April 18, 2016, Carlin and D'Agostino executed a listing agreement, granting Carlin "the sole and exclusive irrevocable right to sell" D'Agostino's Barnegat property through the end of June 2016. Carlin "agree[d] to exert . . . her best efforts to obtain a buyer . . . and . . . register the [property] with all [p]articipants of the Multiple Listing Service, in accordance with its Rules and Regulations." The same day, Carlin and D'Agostino also executed a standard

form of informed consent to dual agency, in which D'Agostino consented to Carlin's representation of both him and the buyer and acknowledged that a dual agency might create a conflict of interest, so Carlin was prohibited from representing either D'Agostino's or the buyer's interests "to the exclusion or detriment of the [other's] interests." The agreement further specified that as a dual agent, Carlin owed a limited fiduciary duty:

> As a [d]isclosed [d]ual [a]gent of both the [s]eller and the [b]uyer, [Carlin] will be working equally for both parties to the real estate transaction and will provide services to complete the transaction without the full range of fiduciary duties ordinarily owed by an agent who represents [s]eller alone, or the [b]uyer alone. In the preparation of offers and counteroffers between [s]eller and [b]uyer, [Carlin] will act only as an intermediary to facilitate the transaction rather than as an active negotiator representing either the [s]eller or [b]uyer in a fiduciary capacity. By consenting to this dual agency, [s]eller is giving up the right to undivided loyalty and will be owed only limited duties of disclosure by [Carlin].

On May 5, 2016, the Ardileses and D'Agostino executed a contract for the sale of D'Agostino's Barnegat property. The parties agreed to a purchase price of $310,000, with a $1000 deposit due April 21, 2016 and a $5000 deposit due May 2, 2016.[4] The Ardileses agreed to provide a mortgage

---

[4] It is unclear why the dates listed had passed before the parties signed the contract.

commitment letter no later than May 31, 2016 and to pay the balance of the purchase price at closing, which was scheduled to occur on July 29, 2016. The contract provided that "all dates and times . . . are of the essence."

Soon thereafter, disputes arose between the Ardileses and D'Agostino. Nevertheless, they agreed to proceed with the sale and executed an addendum to their contract on June 10, 2016. Among other things, the addendum reduced the purchase price to $309,000; required the Ardileses to pay all deposits, to be held in Carlin's or Remax's escrow account, within three days of the document's execution; and changed the mortgage commitment date to June 27, 2016 and the closing date to August 5, 2016.

The Ardileses paid a $1000 deposit on June 7, 2016, a $4000 deposit on June 22, 2016, and another $1000 deposit on August 18, 2016, all of which were provided through checks made payable to Remax. They also obtained a preliminary mortgage commitment letter on July 11, 2016, which they signed the following day. Receipt of a final commitment letter was contingent upon their satisfaction of several outstanding items. D'Agostino emailed Carlin on July 25, 2016 to determine whether the Ardileses had satisfied the conditions yet, and she replied, "Conditions are all satisfied.. Lender can close the end of

this month!!!!"  The following day, D'Agostino emailed the lender to confirm,

and she replied,

> [T]he last things needed are homeowners insurance,
> executed flood determination notice, and proof of
> deposit, which . . . the processor clarified she already
> had.
>
>    . . . .
>
> You can contact [the title company] and [it] will help
> you prepare the documents needed for closing.
>
> Will forward you the final commitment upon receipt,
> will be here sooner than later.

The lender issued the final commitment in a letter dated August 25, 2016.

Meanwhile, D'Agostino had become concerned about the status of the

sale.  He asked the Ardileses if they would agree to a use and occupancy

clause, which would allow him to remain in possession of the property for up

to sixty days after closing in exchange for a $30,000 security deposit and a

payment for each day he remained on the property, but they were not

interested.

By mid-September, the closing had not occurred.  On September 16,

2016, the Ardileses' attorney wrote to D'Agostino, notifying him that the time

for closing was "OF THE ESSENCE" and demanding that he appear for the

closing on September 26, 2016 or be in breach of contract.  Three days before

7

the scheduled closing, at the lender's instruction, Carlin returned $1000 of the deposit to the Ardileses and sent the remaining $5000 to their attorney to be held in trust for D'Agostino. On September 26, 2016, D'Agostino did not appear for the closing. Despite his decision not to appear, he refused to release the $5000 held in trust, and according to Carlin, this prevented her from changing the property's listing status from "pending" to "expired" because the Ardileses were still considered interested buyers.

The following month, D'Agostino listed his property for sale on forsalebyowner.com. According to D'Agostino, he initially had few showings and was surprised he had been unable to schedule more. He grew even more concerned after a prospective buyer asked about other pending offers on the property and then "made a rather low ball offer." This led D'Agostino to believe the buyer was not actually interested and was a spy sent by the Ardileses. D'Agostino claimed that in June 2017, he began to receive numerous calls from real estate agents interested in listing his property. He attributed this change to the fact that Carlin had only changed the listing status of his property to "expired" at the end of May 2017. Sometime during 2017, D'Agostino listed the property with another real estate agent.

A-3399-18T1

Meanwhile, on April 18, 2017, the Ardileses filed a complaint against D'Agostino in the Special Civil Part, alleging breach of contract and seeking to recover the $5000 deposit and home inspection fees. D'Agostino filed an answer, a counterclaim, and a third-party complaint.[5] Among the various parties named in the third-party complaint were the Carlin defendants, against whom D'Agostino asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conspiracy to commit a tort, tortious interference with a prospective economic advantage, and negligence.

D'Agostino's claims against the Carlin defendants were based on his belief that although Carlin agreed to act as a dual agent, "she was . . . acting 99% in favor of the buyers." Specifically, D'Agostino claimed "Carlin lied to [him] about his rights during attorney review, lied about having a final mortgage commitment at the end of July, when in fact it did not exist until [August] 25th, lied about the Ardiles[es'] living situation and intentions, and much more." During November 2016, Carlin lied again when she told D'Agostino that the Ardileses wanted to reinstate the contract and then told the

---

[5] On July 21, 2017, this matter was transferred to the Law Division. On March 4, 2019, the Ardileses and D'Agostino executed a stipulation of settlement, in which they agreed to dismiss their claims in exchange for D'Agostino receiving $4500 of the deposit and the Ardileses receiving the remaining $500.

Ardileses' attorney that "D'Agostino was willing to acquiesce to all of [the Ardileses'] demands."  Additionally, after the contract was unquestionably "dead" in September 2016, Carlin did not update the status of D'Agostino's listing to "expired" until the end of May 2017 and "actually took steps to indicate the exact opposite to other prospective buyers," even though she unequivocally told D'Agostino she was not interested in working with him again.  For example, D'Agostino claimed Carlin continued to update the status with new projected closing dates to occur in 2017. Lastly, D'Agostino asserted that Carlin improperly returned $1000 of the deposit to the Ardileses.

On July 5, 2018, the Carlin defendants filed a motion for summary judgment.  After hearing oral argument, Judge James Den Uyl issued a written decision in favor of the Carlin defendants and an order granting their motion on August 9, 2018.

In addressing D'Agostino's claim for breach of contract, the judge determined there was no evidence of breach.  Carlin was not a party to the contract between the Ardileses and D'Agostino, and she fulfilled her duties under the listing agreement by securing a buyer for D'Agostino's Barnegat property.  The failure to complete the sale was due to D'Agostino's failure to appear for the closing or possibly the Ardileses' alleged failures to meet

contract deadlines. The judge further relied on this reasoning in discussing D'Agostino's claims for breach of the covenant of good faith and fair dealing and tortious interference. The judge added that D'Agostino failed to identify specific actions taken in bad faith, as required for a claim for breach of the covenant of good faith and fair dealing, and D'Agostino failed to produce any evidence that the Carlin defendants interfered with his ability to procure other buyers, as he alleged under his tortious interference claim. As there was no evidence of tortious interference, which formed the basis for D'Agostino's claim of conspiracy to commit a tort, or any agreement to commit such a tort, the judge concluded that D'Agostino failed to make a prima facie showing of conspiracy. Lastly, with respect to D'Agostino's negligence claim, the judge noted that he failed to provide expert testimony on the issues of Carlin's duty as a dual agent and any alleged breach, which was required in a professional negligence case.

On September 14, 2018, Judge Den Uyl denied D'Agostino's motion for reconsideration of the order granting summary judgment in favor of the Carlin defendants, as D'Agostino failed to show that the decision "was based upon a palpably incorrect or irrational basis or that [the judge] either did not consider, or failed to appreciate the significance of the probative, competent evidence."

A-3399-18T1

This appeal ensued.

On appeal, D'Agostino raises the following arguments:[6]

> 2) IN GRANTING THE SUMMARY JUDGMENT MOTION[] OF . . . [THE CARLIN DEFENDANTS], THE COURT HARMFULLY ERRED BY IGNORING THE REAL ESTATE CONTRACT'S EXPRESS TIME OF THE ESSENCE CLAUSE.
>
> . . . .
>
> 4) THE MATTER SHOULD BE ASSIGNED TO A DIFFERENT JUDGE ON REMAND (NOT RAISED BELOW).

We review the grant of a summary judgment motion under the same standard that governed the motion judge. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Brill, 142 N.J. at 540. The judge must view the evidence in a light most favorable to the non-moving party to determine whether a rational

---

[6] We refer only to those points we are considering in this appeal, as explained in footnotes two and three.

factfinder could resolve the issue in favor of that party. Brill, 142 N.J. at 540. While the judge "must accept as true all the evidence which supports the position of the party defending against the motion and must accord him [or her] the benefit of all legitimate inferences which can be deduced therefrom," id. at 535 (alteration in original) (quoting Lanzet v. Greenberg, 126 N.J. 168, 174 (1991)), "[c]onclusory and self-serving assertions . . . are insufficient to overcome the motion," Sullivan v. Port Auth. of N.Y. & N.J., 449 N.J. Super. 276, 283 (App. Div. 2017) (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005)). "[A]n adverse party may not rest upon the mere allegations or denials of the pleading, but must respond by affidavits meeting the requirements of [Rule] 1:6-6[.]" R. 4:46-5(a); see R. 1:6-6 ("If a motion is based on facts not appearing of record, or not judicially noticeable, the court may hear it on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify and which may have annexed thereto certified copies of all papers or parts thereof referred to therein.").

To establish his claim for breach of contract, D'Agostino was required to prove that he and the Carlin defendants entered into a contract, he complied with the contract terms, the Carlin defendants did not comply with the terms,

A-3399-18T1

and the Carlin defendants' breach caused him to suffer a loss.  See Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016).

The only contracts to which Carlin and defendant were parties were the listing agreement and the dual agency agreement.  Under the listing agreement, Carlin agreed to use her best efforts to secure a buyer for D'Agostino's property, which she accomplished when she arranged for the Ardileses to purchase it.  As the motion judge determined, any failure to comply with the terms of the real estate contract, including the time of the essence clause, was attributable to the Ardileses, the only other parties to that contract.

Under the dual agency agreement, Carlin agreed not to represent the Ardileses' interests to the exclusion of D'Agostino's, and having reviewed the record, we are satisfied that D'Agostino has been unable to show that Carlin violated this obligation.  Moreover, we are unpersuaded D'Agostino's allegation that during an April 2016 three-way telephone conversation, Carlin "repeatedly took the Ardiles[es]' side over [his]."  D'Agostino has provided no specific details of the content of this call, and without the opportunity to review it, his assertion is conclusory and, consequently, insufficient to survive a motion for summary judgment.  See Sullivan, 449 N.J. Super. at 283.

For similar reasons, we agree with the motion judge's decision to dismiss D'Agostino's claim for breach of the implied covenant of good faith and fair dealing. To establish this claim, D'Agostino was required to show that Carlin had a bad motive or intention, see Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 225 (2005), and her actions deprived him of "the benefit of the bargain originally intended by the parties," ibid. (quoting 23 Williston on Contracts § 63:22 (Lord ed. 2002)). Our review of the record does not reveal any evidence of bad faith that denied D'Agostino the benefit of the contract between him and Carlin. Again, we are not persuaded by the allegations D'Agostino highlights on appeal that suggest otherwise.

D'Agostino refers to a May 12, 2016 telephone conversation, during which Carlin allegedly falsely told him that the Ardileses had already paid a $1000 deposit, but he provides as proof a self-created transcript of the call, based on his own audio recording, and the transcript omits several minutes of the conversation and includes his "best guess[es] at barely audible phrases." Although referenced in D'Agostino's certification, this purported partial transcript is not certified itself, so we need not consider it. See R. 1:6-6. Nevertheless, this transcript does not assist in proving D'Agostino's claim. D'Agostino has not shown that if the statement was made, it was made in bad

A-3399-18T1

faith and deprived him of the benefits of his contract with the Carlin defendants.

Additionally, D'Agostino relies on the July 25, 2016 email from Carlin, in which she told defendant that the Ardileses had satisfied all conditions of their mortgage commitment. The following day, the lender confirmed the remaining items needed and indicated that the processor had some, if not all, of the information needed. She further instructed D'Agostino to contact the title company to prepare documents needed for closing. Again, D'Agostino has failed to demonstrate that Carlin acted in bad faith, and her conduct deprived him of the benefits of their contract.

Turning to D'Agostino's claim of tortious interference, D'Agostino was required to prove that he "was in 'pursuit' of business," the Carlin defendants interfered with this pursuit intentionally and with malice, their interference caused D'Agostino "loss of the prospective gain," and D'Agostino suffered damages. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989). In this context, "malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Id. at 751. We are satisfied that the record lacks sufficient evidence of D'Agostino's claim, which

is based on the fact that Carlin did not change the status of the property listing from "pending" to "expired" until May 2017.

D'Agostino asserted that he began seeking a new buyer for his property in October 2016, listing it online without the assistance of an agent. He provides no evidence that his inability to sell the property during this time was a result of the listing status, other than his own self-serving and conclusory assertions. Further, Carlin certified that D'Agostino's refusal to release the $5000 deposit in the Ardileses' attorney's trust account precluded her from making this change, as the Ardileses were still considered interested buyers. Therefore, it appears that D'Agostino's own conduct caused the damages he allegedly suffered.

Similarly, we are satisfied that D'Agostino was unable to prove his negligence claim, which required him to show that the Carlin defendants owed him a duty of care, they breached that duty, their breach was a proximate cause of harm he suffered, and he suffered actual damages. See Townsend v. Pierre, 221 N.J. 36, 51 (2015). We are not persuaded by D'Agostino's reliance on Carlin's alleged repeated lies, her return of $1000 of the deposit to the Ardileses, and her failure to change the property's listing status. Even assuming these allegations are true, D'Agostino has not demonstrated that

Carlin's conduct caused him to suffer any damages, as the Ardileses were still willing to purchase the property at the agreed-upon price in September 2016, and D'Agostino declined to sell to them.

Finally, with respect to D'Agostino's civil conspiracy claim, we deem this issue waived, as he did not raise an argument on appeal specific to this claim. See Sklodowsky, 417 N.J. Super. at 657. Nevertheless, we conclude that summary judgment was appropriate, as, given our foregoing determinations, D'Agostino failed to prove that the Carlin defendants committed any wrong or inflicted any injury upon him. See Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177-78 (2005) ("In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement . . . to inflict a wrong against or injury upon another, and an overt act that results in damage.' . . . [T]he 'gist of the claim is not the unlawful agreement, "but the underlying wrong which, absent the conspiracy, would give a right of action."'" (quoting Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993))).

To the extent we have not addressed any of D'Agostino's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part; dismissed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3399-18T1